W. T. GRANT COMPANY, PROSECUTOR, v. BOARD OF RE-
VIEW OF THE UNEMPLOYMENT COMPENSATION COM-
MISSION OF NEW JERSEY, AND RUTH KETTERER,
DEFENDANTS.

Submitted October 6, 1942—Decided January 27, 1943.

Before Justices CASE, DONGES and COLIE.

For the prosecutor, *Katzenbach, Gildea & Rudner* (*Louis Rudner*).

For the defendant Board of Review of the New Jersey Unemployment Compensation Commission, *Clarence F. McGovern*.

The opinion of the court was delivered by

CASE, J. Ruth Bramwell, now Ketterer, a resident of the City of Trenton, had been employed as clerk by W. T. Grant Company, operator of a large chain of variety stores, at its

Trenton store. On April 18th, 1941, she voluntarily left to be married. After her marriage she purposely remained out of employment until October 25th, 1941, when she decided to seek work. She made application for unemployment benefits on the following day. From then on she sought factory employment and on January 15th, 1942, obtained such employment with the Mitchell-Bissell Company. On November 7th, 1941, a copy of applicant's petition for unemployment benefits was served on the Grant Company. That company forthwith replied to the Unemployment Compensation Commission that work was then, November 12th, 1941, available to applicant at its Trenton store. The fact is that there was work comparable with that formerly done by applicant, and at equal or greater wage, available for her at that store during her entire unemployment of eleven weeks. The Commission directed her to go to the Grant store and apply for that job, but she refused to do so for the reason that she desired the higher compensation to be had from factory work. She testified: "I didn't like the work, there wasn't enough money in it for the time I would have to give up, and that is when I proceeded to look further for factory work;" also: "Q. Did they tell you to go there? A. Yes, they did; and I told Mr. Borden I didn't care to go there and I tried to prove to him that I tried to seek work elsewhere;" and further: "* * * coming back to the Grant Company, what did Mr. Borden tell you about Grant Company? A. He told me I should go there and apply for a position. Q. And you told him what? A. I told him I didn't want to go there because I felt I would rather have factory work." And again (italics inserted): "*If they* [viz., factory companies] *were below Grants there would be no reason for it* [viz., accepting factory employment], *I would rather go back to Grants.*" During the period following October 26th until January 15th of the next year applicant asked for work at approximately fifteen places, one of which was the Mitchell-Bissell plant. At the last mentioned place she was told that they might have work for her in about ten days. The next day the force went out on a strike of unforseeable duration. The strike actually lasted for seven weeks; after it was over

applicant again sought employment there and shortly got it. The chance of obtaining work at that plant is suggested by applicant as a reason why she did not go to the Grant store; but we find that that was not the true reason. She continued to seek employment at other places where the work carried the higher wage and where, consequently, she was willing to go. The young woman had had no factory experience and therefore may not be classed, during her unemployment, as a factory worker.

In chronological order there were decisions by a deputy granting benefits to the applicant, and by an appeal tribunal and by the Board of Review sustaining that allowance. Although the applicant was paid unemployment benefits in accordance with the finding, prosecutor seeks a reversal of the determination so that its account may not be charged with the benefits so paid. *R. S.* 43:21-6 (b).

The substantial question that comes to us for decision is whether a young woman who voluntarily quits work without reasons referable to the employment and by personal preference withdraws for six months from the field of employment may thereafter hold herself available for employment only in a restricted field, refuse a position with her former employer comparable in character and wage with her last position and during the period of ensuing idleness receive employment benefits chargeable against the fund maintained by that employer.

The public policy upon which the unemployment statute is built, and which we are to use "as a guide to the interpretation and application" of the statute, as declared in the statute itself, *R. S.* 43:21-2, is to achieve social security by affording "protection against this greatest hazard of our economic life," involuntary unemployment, "which now so often falls with crushing force upon the unemployed worker and his family" and constitutes "a serious menace to the health, morals and welfare of the people" of the state; a security which "can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing

power and limiting the serious social consequences of poor relief assistance." The objective—to protect against involuntary unemployment and the need for that kind of assistance known as "poor relief;" the means—to provide more stable employment and to create a systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, "thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance." To give correct interpretation to the provisions of the statute we must carry in mind the dire and distressing situation against which the statute, as a matter of stated public policy, is directed.

The refusal of the applicant to resume her employment with the prosecutor upon the ground that she wanted a better-paying job was the equivalent of surrendering an existing job and purposely remaining idle until a more lucrative one with some other and then undetermined employer might be found. The Grant Company was providing stable employment and was contributing toward a systematic accumulation of funds against the day when, because of economic instability, the hazard of involuntary unemployment might become a reality. Was the condition which claimant created and sedulously maintained for herself the involuntary unemployment which falls with such crushing force as to be a menace to our public welfare? Or did it depend to any degree upon the failure of industry to provide stable employment? We think not. The fresh acceptance of work with the Grant Company would not have prevented the claimant from surrendering that work to accept a more desirable position elsewhere when such should become available any more than the earlier employment prevented her from quitting when it suited her to do so. From Mrs. Ketterer's own viewpoint the Grant employment held the greater appeal except as to the quantity of wage. To visit upon an employer who is seeking workers the expense of contributing toward the maintenance of an erstwhile worker over a period of months while she willfully withholds herself from employment by that establishment to the single end that she may find a job elsewhere with a bigger wage seems to us not to be within the scope of the enumerated purposes of the statute.

The Board of Review contends, however, that the claimant was available for work within the meaning of the statute (*R. S.* 43:21-4 (c)) and that the board acted properly under *R. S.* 43:21-5 (c) (1) in not disqualifying the claimant for benefits.

*R. S.* 43:21-4 (c) provides: "An unemployed individual shall be eligible to receive benefits with respect to any week only if it appears that: * * * He is able to work, and is available for work."

*R. S.* 43:21-5 (c) (1) provides:

"An individual shall be disqualified for benefits:

*        *        *        *        *        *        *

"(c) If it is found that he has failed, without good cause, either to apply for available, suitable work when so directed by the employment office or the executive director or to accept suitable work when offered him, or to return to his customary self-employment (if any) when so directed by the executive director. Such disqualification shall continue for the week in which such failure occurred and for the three weeks which immediately follow such week (in addition to the waiting period), as determined:

"(1) In determining whether or not any work is suitable for an individual, consideration shall be given to the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence."

Does work, otherwise suitable, become statutorily unsuitable for the single reason that the worker desires and hopes to get, but has not yet obtained, a position elsewhere with larger pay? We think not. An apt illustration may be currently found in the competition for labor in the war industries. It is, of course, quite human that a worker should aspire to the highest wage procurable, and it is her right to seek it. But may a worker detach herself from a position that does not, and by the nature of the industry of which it is a part cannot be made to, carry a wage equal to that paid in a war plant, remain voluntarily and indefinitely idle while

she seeks the more highly paid employment, and meanwhile obtain unemployment benefits chargeable to the fund of that enterprise which she has abandoned and which invites her return—this upon the reasoning that she is *available for and cannot get suitable employment?* The answer to that question must, we think, be in the negative. We find nothing in the proofs which gives serious support to the claimant in any of the considerations enumerated in subdivision (1) of 43:21-5 (c), *supra.* Under the provisions of paragraph 43:21-5 (c) claimant was clearly disqualified for benefits during the week in which she was directed to apply to the Grant Company and for three weeks thereafter. *Cf. S. S. Kresge Co.* v. *Unemployment Compensation Commission et al. (Mo.)*, 162 *S. W. Rep.* (2d) 838. The facts of the case lead us beyond that to the broader view that the applicant had not come into the eligible class. Applying all of the conditions enumerated in *R. S.* 43:21-5 (c) (1), work at the Grant Company and like establishments was suitable for the claimant; so suitable that the commission directed her to go to that company and procure the work that was there to be had. Suitability of work is a mixed question of law and fact on which the final answer does not lie in the applicant for benefits. The applicant deliberately and continuedly shut herself off from a considerable field of suitable employment. By her purposeful and voluntary act she was not wholly available for suitable work, and thus she placed herself, in our opinion, outside of those who, under 43:21-4 (c), were eligible for unemployment benefits. Participation in benefits is granted only to those who in addition to being able to work are available for work. It was not merely that the applicant had failed to apply for a designated job; she had made herself definitely unavailable for any position in that scale of employment. A further tender to her of such a position, at such pay, would have been futile. She was not in the market for such employment. A tender to one who announces in advance that the tender will not be accepted is ordinarily unnecessary. *Trenton Street Railway Co.* v. *Lawlor,* 74 *N. J. Eq.* 828; *Serventi* v. *Cella,* 104 *N. J. L.* 351.

The right of the prosecutor, whose fund would otherwise

be subjected to the charges, to have the foregoing questions passed upon by us is not disputed.

For the reasons stated the decision below will be reversed, but without costs.