704 A.2d 547

WILLIAM F. BRADY, JR., SYLVIA ALBARRAN, HERBERT ALEX-ANDER, CARMEN ALICEA, FREDERICK ALLEN, BEATRICE AMISON, GERALD AMISON, SHIRLEY G. ANDERSON, JOSEPH ANDREWS, JR., MARY L. ARCAMONE, MARY AUSTIN, JAMES BAILEY, DUDLEY BARCALOW, JOSE J. BEAYCHAMPS, MARIETTA BERENATO, JOSEFA BIELSKI, ANNA BIJACSKO, JOHN BLACK, HAROLD BODDEN, SHIRLEY BOTTREL, LEON BOYER, RAYMOND BOYZATH, FREDDIE BRIMLEY, HERBERT BROOKER, JAMES H. BROWNE, ROBERT W. BRYNER, AUGUSTA BUDD, HECTOR G. BURGOS, JOHN E. BURRIS, JAMES CALDWELL, MARIE CAPRIOTTI, ROBERT CASE, MARGARET CHAMBUS, PATRICIA CHARYAK, MATTEO CIPRIANO, BENJAMIN COLE, THOMAS J. COLEMAN, FRED COMO, WILLIAM R. CRAFT, JOANN CREA, LUZ CRUZ, MARY L. CZAP, JOSEPH DALY, SOPHIE DARDZINSKI, KARL H. DEIBLER, BARBARA A. DERRY, MARGAREE DILLARD, EDWARD DOROTA, ANTHONY DOTO, ANATOL DOWBNIA, DAVID J. DOWNING, CHARLES P. DRAGOS, JAMES J. DUNCAN, MARY F. EALY, KURT E. EDER, CUSTODIA FEIJO, SYLVIA FERGUSON, ANTHONY FERRARE, JUAN FLORES, RAFAEL

GARCIA, LESTER GLASCOE, DELORES GLAZEWSKI, ELFRIEDE HALKO, MURRAY A. HALPERN, GERALDINE HAMBLEY, BARBARA A. HARDEN, CHARLOTTE HAYDEN, WALTER HEARNS, ROBERT G. HENNESSEE, THOMAS HORAN, EDWARD HUGO, RICHARD HUTCHINSON, VINCENT IMMORDINO, SARAH C. INNISS, JENA IORIO, BENNIE ISOM, ANDRENA L. JOHNSON, RONALD KASA, DOROTHEA KATO, MARGARET M. KENNEDY, JOHN KOVACH, MARIVA KUHN, SAM LAGARES, RONALD LAWRENCE, CHANG LEE, ANDY LEONARSKI, WALTER LOMAX, ARMAND LORETUCCI, JACQ. MARINELLO, CHARLES B. MARKS, DOLORES MARLIN, MARGARET MASON, JOHN MCELLINNEY, JUAN MEDINA, JOHN MELLODGE, MARY MEROVICH, EUGENE J. MINICH, MINERVA MONTERO, HECTOR M. MORALES, MINERVA MORALES, CORNELIUS MORROW, MARY A. MURPHY, CARMELA C. NICKELS, PETER NICOALI, STANLEY OLSCHEWSKI, EDWARD J. PALLAY, RONALD J. PALMIERI, JAMES S. PETRUCELLI, HARRY PHILLIPS, MATHEW PIERRE, FREYA POLIZIANA, ARTHUR S. POPP, WILFRED W. POWERS, FRANK PRASAK, ROCHELLE PRITCHARD, GIUSEPPE PUGLISI, CARMEN QUILES, ALICIA QUINONES, FREDERICK RAINER, EVELYN RAMSEY, RAYMOND R. RAWA, STANISTAW REMBOWSKI, ASTEN L. RICHARDSON, ROBERT R. ROBINSON, MINNIE SANDERS, ROMAN SATURNINO, KENNETH SCHNEIDER, ANTHONY SCOTT, JASPER SCOTT, JOSEPHINE SECKINGER, THOMAS P. SEHENUK, JOSEPH SEROCK, ELIZABETH SMITH, FRANK SMITH, DOLORES STEWART, WALTER STREHLOW, TAMMY STRYCHARZ, BARBARA SYKES, IDA R. TAYLOR, ANTHONY TESTA, MARY THOMAS, GILBERT TILTON, GEORGE TITUS, EMANUEL TRAMONTANA, EVELYN L. TREIBLY, JOHN TRIPA, FRANK TUCCILLO, EMMA M. TWYMAN, ELIZ. O. VANDEWATER, JAMES L. VANDEWATER, PATRICIA VELEZ, GEORGE VOILAS, ROBERT WALKER, MARIE WALSH, JOHN WALTER, LORETTA WASHINGTON, DELES WATSON, GLADYS WILLIAMS, LIZZIE WILLIAMS, MARGARET WILLIAMS, SHIRLEY WILLIAMS, THOMAS WILLIAMS, ROSE WINROW, GEORGE M. WOODWARD, BONNIE L. WRIGHT AND ROSCOE N. WRIGHT, CLAIMANTS–RESPONDENTS, v. BOARD OF REVIEW AND GENERAL MOTORS CORPORATION, INLAND FISHER GUIDE DIVISION, RESPONDENTS–APPELLANTS.

Argued October 6, 1997—Decided December 22, 1997.

*Alan C. Stephens*, Deputy Attorney General, argued the cause for appellant Board of Review (*Peter Verniero*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel).

*Laurence Reich* argued the cause for appellant General Motors Corporation, Inland Fisher Guide Division (*Carpenter, Bennett & Morrissey*, attorneys).

*David Tykulsker* argued the cause for respondents.

The opinion of the Court was delivered by

GARIBALDI, J.

At issue in this appeal is whether claimants, who elected to participate in an early retirement plan, "voluntarily" left work "without good cause attributable to such work," *N.J.S.A.* 43:21–5(a), thereby rendering them ineligible for unemployment benefits. Claimants are former employees of the Inland Fisher Guide Division of the General Motors Corporation (GM), located in Trenton, New Jersey (Trenton plant). In December 1992, the Trenton plant announced to its employees that GM was offering a special accelerated retirement plan for eligible employees nation-wide. After receiving notice from management that GM intended

to close the Trenton plant by the end of 1993, claimants accepted the early retirement plans. Subsequently, they sought and were granted unemployment compensation benefits. Although the Board of Review reversed the award of benefits, finding that claimants were disqualified under *N.J.S.A.* 43:21–5(a) because they "left work voluntarily without good cause attributable to such work," the Appellate Division concluded that claimants established "good cause" and thus were qualified for unemployment benefits. We granted certification to both parties, 148 *N.J.* 462, 690 *A.*2d 610 (1997); 148 *N.J.* 463, 690 *A.*2d 610 (1997), and now hold that claimants are disqualified from collecting benefits.

I

On or about December 3, 1992, GM notified its employees that it intended to close the Trenton plant permanently by the end of 1993. A short time later, GM announced an incentive retirement program throughout the corporation as a means of shifting workers from its jobs reserve bank program to production positions vacated by those who elected early retirement. Workers in the reserve bank were those who, rather than being laid off, were placed in nonproduction positions. The impetus behind the incentive retirement program was to create openings to avoid laying off those workers from the depleting jobs bank program. The retirement initiative was offered at those GM plants nationwide with a reserve bank and was unrelated to the projected Trenton plant closing. At the time of the announcement, the Trenton plant had approximately 400 people in its reserve bank; Trenton applied for and received approval from GM corporate headquarters for 400 positions for early retirement. Approximately 386 employees, none of whom received a layoff notice, took advantage of the mutual retirement package and retired.

To be eligible for the retirement incentive, workers were required to have at least ten years of service with GM and be at least fifty years of age. Under the plan, qualified workers fell into two categories. Those between the ages of fifty and sixty-two

received an early, unreduced pension; a supplemental pension that would be paid until they reached the age of sixty-two; and employer-paid lifetime comprehensive medical care. The medical coverage was subject to the governing collective bargaining agreement between GM and the United Auto Workers Union (UAW), which was periodically renegotiated upon the expiration of a governing contract. Retired employees received approximately $60 per week for each year of service. The representative claimant, who retired at the age of fifty-two with more than fifteen years of service, testified before the Appeal Tribunal that he would receive approximately $940 a month. An additional feature of the package was that there was no outside earnings limitation. Retired workers could seek employment elsewhere at any wage rate without any effect on the pension. Approximately 300 employees in that category accepted early retirement.

Under the second category, workers aged sixty-two or older received the same retirement benefits as the previous category plus $10,000 toward the purchase of a new GM car. Approximately seventy employees who chose to accept the incentive fell into that category. All employees who elected to take the retirement package were obliged to retire on February 1, 1993 or March 1, 1993. Their applications could be withdrawn at any time prior to those dates. Numerous employees who initially accepted the early retirement offer withdrew their applications before March 1, 1993.

From December 1992 until the end of February 1993, various statements about the anticipated plant closing were issued. On December 23, 1992, a "Message from the Manager" to the employees included the following:

For those of you with doubts—yes, the plant is closing. The time table by product line and who the new sources will be are being defined now. I would hope by January 15th, we would have a good firm idea on where our products are going. This will then tell us how many job opportunities are available to move with the jobs. So do not contact labor relations until at least January 18th, for relocation job opportunities with GM. We will try and keep everyone informed in the Tribune and Message from the Manager. I can only say for now for sure that we are working on the closure plan and some job opportunities will be available.

The announcement further encouraged employees not to forego the accelerated retirement plan based on speculation that the Trenton plant might remain open:

> There are rumors circulating about plans and efforts to save the plant. Let me give you my opinion of what I know. Since our announcement of December 3, I have spoken to our divisional offices executives many times.
>
> Believe me when I say that all talk about potentially keeping Trenton open is false optimism originating right from this plant. No one at our divisional executive level is actively working on a scenario that could possibly keep Trenton open. In fact, most of their calls involve giving them timing about when products will leave. I know I'm being blunt, but I know there are many people making difficult decisions regarding retirement. I would not want any rumors influencing those decisions. The worst thing anyone could do would be to turn down one of the best mutual retirement programs available because of a rumor and then later lose what is available when the plant closes.

In response to the company's December 23, 1992 Message to the Manager, the union published an undated "Special Update" to inform its members of the union's efforts to keep the plant open and of alternative job opportunities. The Special Update stated:

> If our work is transferred to another GM plant the International Union will have to negotiate the number of moves we would be entitled to within the Corporation. Our members would move with full seniority unless mutually agreed to by the parties. This is Paragraph 96 of the National Agreement and can be found on page 77 of the Agreement.
>
> We were told by Steve Yokich that the SUB [Supplemental Unemployment Benefits] Fund should make it for the life of the Agreement (Sept. 14, 1993). If any one is laid off they will collect unemployment and SUB. If your unemployment runs out you will be collecting all SUB. As of today, the SUB fund has nearly $700 million dollars. If these monies run out, the SUB program would revert back to the way it did in 1987 with the credit system. As of January 4th, 1993 we were informed that the JOBS Bank will continue to be funded until March 1st, 1993.

On February 9, 1993, the employees of the Trenton plant were given a tentative plan for the plant closing in another Message from the Manager. That Message began:

> Let me leave no doubt—the plant is closing. Many people take the absence of visible movement of jobs, tools, and equipment as a sign that something is up. Not so! The closing of this large facility is a complex process which takes significant planning . . . Trenton closing will now be aggressively planned . . .

The Message further indicated that a small number of workers would be laid off in March 1993 and that the first large layoff would occur in May or June 1993, perhaps involving as many as

500 workers. The next large layoff was scheduled for September with the rest of the employees to be terminated by the end of the year. Anticipated layoffs would be based upon seniority status with workers having greater seniority displacing those with lesser seniority.

On February 25, 1993, Personnel Director Theodore A. Cannon posted Bulletin Board Notice 93–9 in the Trenton plant:

> In the future, there may be opportunities for extended preferential employment opportunities available to our employees as a result of the December 3, 1992 [closure] announcement. Under the National Agreement provisions the parties may mutually agree that certain seniority employees may be eligible for extended preferential employment consideration in specified area hire areas or plants represented by UAW which may not be in such areas.
>
> It is our understanding that, in the future there may be additional employment opportunities in Baltimore. To determine the number of employees who are interested in these opportunities, we are conducting a survey. Employees who desire to apply for the prospective opportunities should report to the Employment Office and include their name on the survey list prior to March 5, 1993.

Two days after the March 1, 1993 deadline for electing early retirement, GM announced its decision to keep the Trenton plant open in the hopes of negotiating a sale to another corporation. Currently, the Trenton plant remains open and no layoffs occurred.

Had the plant shut down, laid off employees could have applied for unemployment and also would have received Supplemental Unemployment Benefits (SUB) provided by GM until early retirement was available at the age of fifty-five [1] or until SUB ran out of funds. During this time, the workers' medical benefits, except dental coverage, would have continued. Under the SUB program, a worker would have received approximately $450 on a weekly basis. Once the SUB benefits were exhausted, the workers would have received payments under the Guaranteed Income Strain (GIS) program equaling approximately $346 per week. Under the

---

[1] Article II, Section 2(b) of the General Motors Hourly–Rate Employees Pension Plan provides that an employee with at least ten years of service, who is laid off as the result of a plant closing, is entitled to a mutual retirement package, including an unreduced pension, upon reaching the age of 55.

GIS program, the workers' employer-paid hearing, vision, and prescription drug coverage would have ended after twenty-five months. In the event of a layoff, claimants maintained contractual seniority rights that would have afforded them protected status and, thus, the opportunity for continued work at the Trenton plant through any initial layoffs. Those contractual transfer rights also offered claimants the opportunity to apply for positions at other GM facilities. Employees at the Trenton plant were informed of possible positions at GM facilities in Maryland and Tennessee. On January 27 and 28, 1993, representatives of GM's Tennessee plant visited the Trenton plant and accepted applications for transfer. No claimant, however, received a response to his or her transfer application before March 1, 1993. Some 200 employees at the Trenton Plant were accepted for transfer.

After accepting the early retirement package, claimants filed separate claims for unemployment benefits. The Deputy Director of the Division of Unemployment and Disability Insurance (Deputy) found claimants eligible for benefits, reasoning that claimants left work with good cause attributable to work because the layoffs were imminent when they elected early retirement. GM filed a mass appeal from the Deputy's determination and the Appeal Tribunal affirmed. Only one of the claimants, George Titus, testified before the Appeal Tribunal. As stated earlier, Titus elected to retire early at the age of fifty-two with more than fifteen years seniority, and received a pension of approximately $940 per week. Titus testified that he decided to accept the retirement package because he had no doubt that the plant would be closing. He also noted that he wanted to maintain medical coverage that was included as part of the plan.

GM appealed to the Board of Review, Department of Labor (Board). The Board conducted a supplemental hearing and reversed, rejecting the premise that GM placed such a strong temptation in front of the workers that it was the only prudent course of action available. The Board emphasized that had the claimants opted not to retire and if they were eventually laid off,

they would have been in essentially the same situation as they found themselves after accepting early retirement. Because they did not stand to suffer financially by not accepting the incentive package, this was not a case where the claimants had no reasonable choice but to retire.

Moreover, the Board noted that had the claimants remained at the Trenton plant they could have continued to work for at least six months prior to the planned closing. That conclusion was based on the fact that each claimant had at least ten years seniority with GM and would not have been among the initial employees let go if the plant had closed as anticipated. Thus, the Board concluded, claimants did not leave work because of imminent layoff. The Board distinguished this case from *Trupo v. Board of Review*, 268 *N.J.Super.* 54, 632 *A.*2d 852 (App.Div.1993), where the Appellate Division reasoned that a worker facing "the daily fear of a future employment layoff," *id.* at 60, 632 *A.*2d 852, might have good cause to leave if her fear of imminent layoff or loss of medical coverage were based upon "definitive objective facts." *Id.* at 61, 632 *A.*2d 852. Here, the Board found that the prospect of layoff was not imminent given the substantial amount of time that the claimants could have continued to work. Based on that determination, the Board concluded the claimants left work voluntarily without good cause.

The Appellate Division disagreed. Relying on *Trupo, supra,* the court found that claimants' fear of layoff was based on the unequivocal statements made by GM that the plant would be closing by the end of 1993. Addressing the issue of whether the claimants who elected to participate in the early retirement program "voluntarily" left work "without good cause attributable to such work," *N.J.S.A.* 43:21–5(a), the Appellate Division observed that by not accepting the incentive package the claimants would have been required to relinquish complete health insurance coverage and pension. Furthermore, there was no assurance of any transfer rights to other GM facilities by the March 1, 1993 deadline for electing early retirement. The court concluded that

the Board's decision could not be sustained on the record. Noting that the *Trupo* standard did not permit double recovery, the court further held that *N.J.S.A.* 43:21–5(a) required that the award of unemployment benefits be reduced by the amount of pension or retirement pay received by the workers.

## II

The judicial capacity to review administrative agency decisions is limited. *Public Serv. Elec. v. N.J. Dep't of Envtl. Protec.*, 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985) (citation omitted). Moreover, "[i]n reviewing the factual findings made in an unemployment compensation proceeding, the test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." *Charatan v. Board of Review*, 200 *N.J.Super.* 74, 79, 490 *A.*2d 352 (App.Div. 1985) (citations omitted); *see also Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992) ("Appellate courts must defer to an agency's expertise and superior knowledge of a particular field. Thus, if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result.") (citations omitted). If the Board's factual findings are supported "by sufficient credible evidence, courts are obliged to accept them." *Self v. Board of Review*, 91 *N.J.* 453, 459, 453 *A.*2d 170 (1982); *Goodman v. London Metals Exchange, Inc.*, 86 *N.J.* 19, 28–29, 429 *A.*2d 341 (1981) (same).

Unless a Court finds that the agency's action was arbitrary, capricious, or unreasonable, the agency's ruling should not be disturbed. *See In re Warren*, 117 *N.J.* 295, 296, 566 *A.*2d 534 (1989). The Court "can intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy." *George Harms Constr. v. Turnpike Auth.*, 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994). Under that

standard, the scope of judicial review of an agency's action is restricted to four inquiries:

(1) whether the agency's decision offends the State or Federal Constitution;

(2) whether the agency's action violates express or implied legislative policies;

(3) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*George Harms Constr., supra,* 137 *N.J.* at 27, 644 *A.2d* 76 (citing *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.2d* 712 (1963); *In re Larsen,* 17 *N.J.Super.* 564, 570, 86 *A.2d* 430 (App.Div.1952)).]

We address in this opinion only the second and fourth factors, *i.e.,* whether the Board's action violated the express or implied legislative policies of New Jersey's Unemployment Compensation Act (Act), *N.J.S.A.* 43:21–1 to –56(Act), or whether in applying those legislative policies the Board erred in reaching its conclusion. To ascertain the underlying legislative policies of the Act, we examine the Act's declaration of public policy and its legislative history.

### III

The statutory mission of the Act is set out at *N.J.S.A.* 43:21–2:

[T]he public policy of this state is declared to be as follows: economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the [L]egislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life.... The [L]egislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state requires the enactment of this measure....

Through this declaration of public policy, the Legislature indicated that the underlying mission of the Act is "to afford protection against the hazards of economic insecurity due to *involuntary* unemployment." *Yardville Supply Co. v. Board of Review,* 114 *N.J.* 371, 374, 554 *A.2d* 1337 (citing *Krauss v. A. & M. Karagheusian,* 13 *N.J.* 447, 455, 100 *A.2d* 277 (1953); *Schock v. Board of*

*Review,* 89 *N.J.Super.* 118, 125, 214 *A.*2d 40 (App.Div.1965), *aff'd,* 48 *N.J.* 121, 223 *A.*2d 633 (1966)).

■ This Court has recognized that the primary purpose of the Act is "to provide a cushion for the workers of New Jersey 'against the shocks and rigors of unemployment.'" *Carpet Remnant Warehouse v. N.J. Dep't of Labor,* 125 *N.J.* 567, 581, 593 *A.*2d 1177 (1991) (citing *Provident Inst. for Sav. v. Division of Employment Sec.,* 32 *N.J.* 585, 590, 161 *A.*2d 497 (1960)). Furthermore, "'[t]he purpose of the [A]ct is to provide some income for the worker earning nothing, because he is out of work *through no fault or act of his own.*'" *Yardville, supra,* 114 *N.J.* at 375, 554 *A.*2d 1337 (quoting *Schock, supra,* 89 *N.J.Super.* at 125, 214 *A.*2d 40); *see also Battaglia v. Board of Review,* 14 *N.J.Super.* 24, 27, 81 *A.*2d 186 (App.Div.1951) (same).

■ Although the Act is to be liberally construed in favor of claimants to effectuate its remedial purposes, *Yardville, supra,* 114 *N.J.* at 374, 554 *A.*2d 1337; *Sporn v. Celebrity, Inc.,* 129 *N.J.Super.* 449, 459, 324 *A.*2d 71 (Law Div.1974), we have emphasized that "it is also important to preserve the [unemployment insurance trust] fund against claims by those not intended to share in its benefits. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases." *Yardville, supra,* 114 *N.J.* at 374, 554 *A.*2d 1337 (citing *Krauss, supra,* 13 *N.J.* at 455–56, 100 *A.*2d 277; *Schock, supra,* 89 *N.J.Super.* at 125, 214 *A.*2d 40). The Act, then, is designed to serve not simply the interest of the unemployed, but also the interest of the general public. *See Sporn, supra,* 129 *N.J.Super.* at 459, 324 *A.*2d 71; *Stonco Elec. Products Co. v. Board of Review,* 106 *N.J.Super.* 6, 9, 254 *A.*2d 111 (App.Div.1969); *Zielenski v. Board of Review,* 85 *N.J.Super.* 46, 52, 203 *A.*2d 635 (App.Div.1964). "To give [the] correct interpretation" of this policy, the Court "must carry in mind the dire and distressing situations against which the statute, as a matter of stated public policy, is directed." *W.T. Grant Co. v. Board of Review,* 129 *N.J.L.* 402, 405, 29 *A.*2d 858 (1943).

The legislative history of *N.J.S.A.* 43:21–5(a) supports the conclusion that claimants are not entitled to unemployment benefits. Prior to 1961, that statute did not disqualify individuals who left work for "good cause" from receiving unemployment compensation benefits, regardless of whether such cause was attributable to work or for personal reasons. *Yardville, supra,* 114 *N.J.* at 374, 554 *A.*2d 1337; *see also Krauss, supra,* 13 *N.J.* at 464, 100 *A.*2d 277 ("The Legislature contemplated that when an individual voluntarily leaves a job under the pressure of circumstances which may reasonably be viewed as having compelled him to do so, the termination of his employment is involuntary for the purposes of the [A]ct."). In construing the preamendment Act, this Court observed that "good cause" may "lie in extraneous factors exerting compulsive pressure upon the claimant and causing him to quit." *Krauss, supra,* 13 *N.J.* at 464, 100 *A.*2d 277.

The Legislature, however, amended the statute in 1961 to disqualify claimants who left work for purely personal reasons. *See Stauhs v. Board of Review,* 93 *N.J.Super.* 451, 457, 226 *A.*2d 182 (App.Div.1967) ("[T]he intention of the Legislature in passing the 1961 amendment was to exclude from the term 'good cause' ... all causes personal to a claimant which are not connected with the work."); *Self, supra,* 91 *N.J.* at 457, 453 *A.*2d 170 (noting that purpose of amendment was to "eliminate the eligibility of persons who leave work for good, but personal causes"); *Rider College v. Board of Review,* 167 *N.J.Super.* 42, 46, 400 *A.*2d 505 (App.Div. 1979) ("[C]auses personal to a claimant ... come within the disqualification of the statute.").

The current statutory language provides that a claimant shall be disqualified from receiving unemployment compensation benefits "[f]or the week in which the individual has left work *voluntarily without good cause attributable to such work,* and for each week thereafter until the individual becomes reemployed...." *N.J.S.A.* 43:21–5(a) (emphasis added). In applying section 43:21–5(a), a court must "differentiate between (1) a voluntary quit with good cause attributable to the work and (2) a

voluntary quit without good cause attributable to the work." *Self,*
*supra,* 91 *N.J.* at 457, 453 *A.*2d 170 (citing *DeLorenzo v. Board of*
*Review,* 54 *N.J.* 361, 363, 255 *A.*2d 248 (1969)); *see, e.g., Morgan,*
*supra,* 77 *N.J.Super.* at 214, 185 *A.*2d 870 (finding that leaving
work because of commuting problems was a good, but personal
reason); *Pagan v. Board of Review,* 296 *N.J.Super.* 539, 543, 687
*A.*2d 328 (App.Div.), *certif. denied,* 150 *N.J.* 24, 695 *A.*2d 667
(1997) (finding that leaving work because of domestic violence,
although a compelling reason, was a personal decision disqualify-
ing claimant from benefits); *DeSantis v. Board of Review,* 149
*N.J.Super.* 35, 38, 372 *A.*2d 1362 (App.Div.1977) (holding that
employee's quitting due to frustration and disappointment in not
receiving raise was not cause attributable to work).

 Although "good cause" is not statutorily defined, New
Jersey courts have construed the phrase to mean " 'cause suffi-
cient to justify an employee's voluntarily leaving the ranks of the
employed and joining the ranks of the unemployed.' " *Domenico*
*v. Board of Review,* 192 *N.J.Super.* 284, 287, 469 *A.*2d 961 (App.
Div.1983) (quoting *Condo v. Board of Review,* 158 *N.J.Super.* 172,
174, 385 *A.*2d 920 (App.Div.1978)); *see also Associated Utility*
*Serv. v. Board of Review,* 131 *N.J.Super.* 584, 586, 331 *A.*2d 39
(App.Div.1974) (quoting *Goebelbecker v. State,* 53 *N.J.Super.* 53,
57, 146 *A.*2d 488 (App.Div.1958)); *Zielenski, supra,* 85 *N.J.Super.*
at 52, 203 *A.*2d 635 (same); *Morgan, supra,* 77 *N.J.Super.* at 213,
185 *A.*2d 870 (same). The test of "ordinary common sense and
prudence" must be utilized to determine whether an employee's
decision to leave work constitutes good cause. *Zielenski, supra,*
85 *N.J.Super.* at 52, 203 *A.*2d 635. Such cause "must be com-
pelled by real, substantial and reasonable circumstances not imagi-
nary, trifling and whimsical ones." *Domenico, supra,* 192 *N.J.Su-*
*per.* at 288, 469 *A.*2d 961 (citing *Krauss, supra,* 13 *N.J.* at 464, 100
*A.*2d 277). A claimant has the " 'responsibility to do whatever is
necessary and reasonable in order to remain employed.' " *Heulitt*
*v. Board of Review,* 300 *N.J.Super.* 407, 414, 693 *A.*2d 155 (App.
Div.1997) (quoting *Zielenski, supra,* 85 *N.J.Super.* at 53–54, 203

A.2d 635); *see also Condo, supra,* 158 *N.J.Super.* at 175, 385 *A.*2d 920 (same).

The Appellate Division in two cases has addressed the issue of unemployment benefits in the context of early retirement, first in *Trupo, supra,* 268 *N.J.Super.* 54, 632 *A.*2d 852, and more recently in *Fernandez v. Board of Review,* 304 *N.J.Super.* 603, 605, 701 *A.*2d 747 (1997). In both cases, the Appellate Division considered whether the claimants voluntarily quit without good cause attributable to their employment. In *Trupo,* the claimant, at the age of sixty-one, accepted an early retirement package offered by her employer as an effort to reduce its work force. *Trupo, supra,* 268 *N.J.Super.* at 56, 632 *A.*2d 852. There, the claimant admitted that her employer neither specified which positions would be terminated nor decided which employees would be laid off or which workers would be transferred. *Ibid.* Trupo testified that she feared that she would become unemployed and medically uninsured if she did not accept the retirement package. *Ibid.* Because she was sixty-one years old and the head of her household, Trupo asserted that she "believed she had no choice but to accept the early retirement proposal," and that fear constituted good cause attributable to her work. *Ibid.*

In *dictum,* the *Trupo* court set forth two requirements that the claimants had to meet to collect unemployment benefits: (1) that claimants' "subjective fear [of imminent layoff] was based upon definitive objective facts ... to buttress [the] belief that [their] job[s] would actually be eliminated in the impending work reduction," and (2) that claimants would suffer a substantial economic loss. *Id.* at 61, 632 *A.*2d 852. The Appellate Division found that Trupo failed to satisfy her burden to meet those two prongs. Accordingly, the court affirmed the Board's decision denying Trupo unemployment benefits. The court reasoned that

[a]lthough we perceive Trupo's decision as subjectively prudent and based upon common sense, we cannot conclude based upon an absence of objective proof in the record, that the disqualification decision was reversible as a matter of law.

[*Id.* at 62, 632 *A.*2d 852.]

In *Fernandez, supra,* 304 *N.J.Super.* at 605–06, 701 *A.*2d 747, the Appellate Division found that an American Telephone and Telegraph (AT & T) employee's early retirement based on a general letter sent to all employees in his division, which informed them that they could choose an early retirement plan because AT & T was in the process of restructuring and noted that there were "many more people in [his division] than there [would] be following" the reorganization, was insufficient to establish "good cause." The Appellate Division held "that an employee's acceptance of a 'severance package' or 'early retirement incentive package' bars him from receiving unemployment benefits unless he shows he accepted the package because of a real, imminent, and substantial risk of losing his job." *Id.* at 607, 701 *A.*2d 747. The court observed that that standard comports with decisions of other jurisdictions. *Ibid.* Both opinions are illustrative of some of the factors that the Board should consider in determining whether an employee who accepts an early retirement package has good cause to leave work. Moreover, both opinions agree with the public policy and legislative history as to what constitutes good cause in the context of an employee's acceptance of an early retirement incentive.

Whether a particular state awards unemployment benefits to an employee who elects early retirement depends on the laws of that state. Nonetheless, most other jurisdictions have reached similar results. *See, e.g., In re Astrom,* 362 *So.*2d 312, 315 (Fla.Dist.Ct. App.1978) (reasoning that although claimant's election of early retirement was reasonable in light of the impending close of operations, the employer never ascertained the date that employees would be terminated and "work was available at the time that the claimants elected to accept the benefits offered for early retirement"); *In re Fontaine,* 657 *N.Y.S.*2d 216, 216 (N.Y.App.Div. 1997) (finding that claimant who accepted early retirement incentive from Air Force in face of downsizing but who was never told her position would be abolished had voluntarily left her employment without cause); *Appleman v. Commissioner of Labor,* 211 *A.D.*2d 933, 621 *N.Y.S.*2d 232, 233 (1995) (finding that legal

secretary who left her employment to take advantage of employer's early retirement benefit, who was told her remaining employment could not be guaranteed but was not told she would be laid off if she did not accept the retirement plan, was disqualified from accepting unemployment benefits); *Staub v. Unemployment Comp. Bd. of Review,* 673 *A.*2d 434, 439 (Pa.Commw.Ct.1996) (denying unemployment benefits to claimant because continuing work was available had he not accepted early retirement); *Goewert v. Anheuser Busch, Inc.,* 82 *Wash.App.* 753, 919 *P.*2d 106, 110 (1996), *rev. denied,* 131 *Wash.*2d 1005, 932 *P.*2d 644 (1997) (denying benefits to employee whose employer announced intention to reduce work force and could not guarantee alternative position before deadline to participate in retirement program). *But see Reserve Mining Co. v. Anderson,* 377 *N.W.*2d 494, 497–98 (Minn. Ct.App.1985) (awarding unemployment benefits to employee who chose early retirement after employer notified her that her position was being eliminated); *Philadelphia Parking Auth. v. Unemployment Comp. Bd. of Review,* 654 *A.*2d 280, 283–84 (Pa. Commw.Ct.1995) (awarding benefits to an employee who was notified by his employer that it intended to make a serious effort to downsize its operation and that the employee's name was on a list of people who could be laid off); *Terry v. Employment Sec. Dep't,* 82 *Wash.App.* 745, 919 *P.*2d 111, 115 (1996) (awarding unemployment benefits to employee who chose early retirement after employer notified her by letter that she needed to find other work in the company at reduced pay or she would be laid off).

In New Jersey, the Department of Labor, pursuant to Executive Order No. 66 (1978), has proposed regulations to amend *N.J.A.C.* 12:17, the rules enacted pursuant to the Unemployment Compensation Act. The proposed regulations only differ from the current rules in that "they are more detailed and express the Department's longstanding policies regarding benefit eligibility and disqualification which were not previously codified ... but practiced by the Department." 28 *N.J. Reg.* 4759. More specifically, the proposed regulations emphasize that the new rules "provide philosophical emphasis that unemployment is an insur-

ance program rather than an entitlement program" and "tighten eligibility procedures for voluntary separations" from employment. *Ibid.* "In addition, the proposed new rules will better protect the interests of workers and employers who contribute to the Unemployment Insurance Trust Fund by ensuring that only eligible individuals receive benefits." 28 *N.J. Reg.* 4760. Relevant to our discussion, the regulations provide that employees notified of an impending layoff will qualify for unemployment benefits if they leave work voluntarily within four weeks of the discharge date. 28 *N.J. Reg.* 4768 at 12:17–9.5. The new regulations provide guidance as to how far off termination must be to be "imminent." [2]

## IV

### A. *Imminence*

Claimants bear the burden of proof to establish their right to unemployment benefits. *Zielenski, supra,* 85 *N.J.Super.* at 51, 203 *A.*2d 635; *DiMicele v. General Motors Corp.,* 51 *N.J.Super.* 167, 171, 143 *A.*2d 799 (App.Div.1958), *aff'd,* 29 *N.J.* 427, 149 *A.*2d 223 (1959). Furthermore, when an employee leaves work voluntarily, he bears the burden to prove he did so with good cause attributable to work. *Zielenski, supra,* 85 *N.J.Super.* at 52, 203 *A.*2d 635; *Goebelbecker, supra,* 53 *N.J.Super.* at 59, 146 *A.*2d 488.

Claimants contend that the Trenton management's statements demonstrate that their layoffs were imminent or, alternatively, that GM wanted the workers to believe their layoffs were imminent. The management notices, however, indicate only that the plant was anticipated to be closed by the end of 1993; they do not specifically target particular employees. The workers were

---

[2] Although the Department of Labor has advised the Court that the pending regulations will expire unadopted on December 31, 1997, the Department of Labor intends to resubmit a revised, more comprehensive draft at a future date. This opinion simply relies on the public policy implications of the proposed rules as an indication the layoffs in this case were not imminent.

notified that the closing of the plant was an extensive, complicated process that could not take place quickly. Based on the projected timeline and claimants' "bumping" rights due to seniority, claimants would have been afforded a substantial amount of time to continue working at the Trenton plant. Those contractual seniority rights in addition to transfer rights undermine the finding that claimants' layoffs were indeed imminent. Furthermore, the notices do not establish a definite closing date, and therefore, do not support claimants' contention that their layoffs were imminent.

Based upon its own supplemental hearing and its expertise in the employment field, the Board determined that claimants here did not elect early retirement in lieu of imminent layoff. While faced with a tough decision, claimants ultimately made a personal one to accept the retirement package.

There is no dispute that claimants took early retirement more than four weeks before any layoffs began. Although claimants' counsel argues that such a conclusion is made with the benefit of hindsight, it was clear even before March 1, 1993 that, according to the tentative closing schedule, claimants would be terminated at the earliest in September 1993. No definite closing date was ever established. Based on that timeline and claimants' level of seniority, they could have continued to work for several months. While claimants may have had a subjective fear of layoff, such fear was not "based upon definitive objective facts." *Trupo, supra,* 268 *N.J.Super.* at 61, 632 *A.*2d 852; *see also In re Astrom, supra,* 362 *So.*2d at 315 (holding in a similar situation that impending layoffs were not imminent although "[t]here was certainty of the eventual lay off [because] work was available at the time that the claimants elected to accept the benefits offered for early retirement").

### B. *Substantial Loss*

Moreover, claimants have not established that they would have suffered significant economic harm if they elected not to retire. The consideration of any economic loss faced by claimants is not new to the determination of unemployment eligibility. It is

possible that the threat of significant economic loss, based upon objective facts, could amount to cause sufficient to justify leaving the ranks of the employed.

For instance, in *Johns–Manville Products Corp. v. Board of Review,* 122 *N.J.Super.* 366, 300 *A.*2d 572 (App.Div.1973), a machinist applied for unemployment benefits after his employer offered him work in a less skilled position that would have resulted in a decrease in the machinist's pay. In his original position, the claimant's wage rate was $4.27 per hour. In the new position, he would have been paid between $3.21 and $3.35 per hour. The Board of Review found that such a substantial reduction in the claimant's salary constituted good cause to leave his work. *Id.* at 369, 300 *A.*2d 572; *see also LeCroy v. Unemployment Appeals Comm'n,* 654 *So.*2d 1054, 1056 (Fla.Dist.Ct.App.1995) (finding that substantial decrease in claimants' pay afforded them with good cause); *Mangan v. Bernardi,* 131 *Ill.App.*3d 1081, 87 *Ill.Dec.* 412, 415, 477 *N.E.*2d 13, 16 (1985) (holding that substantial reduction in wages and loss of fringe benefits, including medical insurance, constituted good cause to leave work); *Cook v. Playworks,* 541 *N.W.*2d 366, 368 (Minn.Ct.App.1996) (recognizing that a substantial reduction in wages may provide employee with good cause to quit). The court upheld the Board's determination, emphasizing that the Board's finding was supported by the substantial evidence in the record and that its decision was "entitled to particular weight because of the administrative tribunal's familiarity with and expertise in employment matters." *Johns–Manville, supra,* 122 *N.J.Super.* at 369–70, 300 *A.*2d 572. Although the issue in *Johns–Manville, supra,* involved a substantial reduction in wages, an analogous rationale applies to a substantial loss in the context of early retirement.

Claimants suffered no substantial economic loss. Rather, in exchange for their early resignations, employees accepted a mutually beneficial retirement package. To be eligible for the incentive retirement plan, claimants were required to be at least fifty years of age. If they had elected to remain at the Trenton plant and it

had closed as planned, those who were fifty-five would have received the same unreduced pension package, as provided by Article II, section 2(b) of the General Motors Hourly–Rate Employees Pension Plan. Those between the ages of fifty and fifty-five would have received SUB and GIS income with no appreciable loss of medical benefits. The record demonstrates that, under SUB, a worker would have received $450 per week, an amount equivalent to a pension for an employee with thirty years of service (calculated at $60 per week per year of service). In the event that the SUB funds were depleted, laid off employees would have received $346 per week through GIS, an amount equivalent to a pension for an employee with twenty-five years of service. Both of those amounts exceeded the maximum weekly unemployment compensation benefit rate in 1993. As such, claimants would receive no economic benefit from an award of unemployment benefits.

The Board's determination that claimants would not incur a substantial economic loss or loss of medical benefits is supported by the substantial credible evidence in the record. That conclusion coupled with the finding that the layoffs were not imminent disqualified claimants from receiving unemployment benefits.

## V

Claimants are not the type of workers the Act is designed to protect. Claimants, rather than being involuntarily laid off and receiving no income, elected an attractive early retirement package. The package included beneficial features, including supplementary income and employer-paid medical benefits. Although there is no dispute that GM encouraged claimants to accept the incentive retirement plan, such encouragement did not amount to coercion. The strongest words from management encouraging workers to take advantage of the incentive retirement program came in late December 1992, noting that "[t]he worst thing anyone could do would be to turn down one of the best mutual retirement programs available because of a rumor [that the plant might

remain open] and then later lose what is available when the plant closes." Although the employees' response to management's advice was an understandable reaction, it was not the result of coercion or the lack of essential information. Moreover, the workers were able to consider their choice with the help of their union representatives. The employees made a difficult decision, but nonetheless a personal one, to accept the early retirement package.

Unemployment compensation is an insurance, not an entitlement, program designed to provide a cushion for workers who are involuntarily unemployed through no fault or act of their own. *N.J.S.A.* 43:21–2; *Yardville, supra,* 114 *N.J.* at 375, 554 *A.*2d 1337. Here, claimants did not do "whatever is necessary and reasonable" in order to remain employed. *Heulitt, supra,* 300 *N.J.Super.* at 414, 693 *A.*2d 155.

## VI

The findings of the Board of Review that claimants failed to establish by "definitive objective facts," (1) a well-grounded fear of "imminent layoff" and (2) that they "would suffer a substantial loss by not accepting early retirement," were supported by sufficient, credible evidence in the record. Those findings were neither arbitrary nor capricious. Further, those findings comport with the public policy and legislative history of the Act and specifically, *N.J.S.A.* 43:21–5(a). Under the appropriate standard of review, the Board's decision not only furthered the express legislative policies of the Act, but also reached a reasonable result based on the relevant factors in this case.

Accordingly, we reverse the judgment of the Appellate Division, thereby reinstating the decision of the Board of Review.

COLEMAN, J., dissenting.

I would affirm the judgment below finding that claimants are eligible for unemployment benefits substantially for the reasons stated by the Appellate Division. General Motors's communica-

tions to its employees that the plant was closing were unequivocal and unyielding. It persisted in those communications until two days *after* the deadline to file for early retirement had passed. Under the totality of circumstances, claimants established a reasonable belief of a real, substantial, and imminent risk of losing their jobs.

Furthermore, a finding that claimants are eligible to collect unemployment benefits will not result in a double recovery because *N.J.S.A.* 43:21–5a requires a set-off based on pension or retirement payments received by claimants. Consequently, I dissent.

STEIN, J., joins in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For affirmance*—Justices COLEMAN and STEIN—2.