**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2964-21

GABRIEL JIMENEZ,

     Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF
LABOR, and
GENEWIZ, INC.,

     Respondents.

_____

        Submitted September 19, 2023 – Decided December 13, 2023

        Before Judges Sumners and Smith.

        On appeal from the Board of Review, Department of Labor and Workforce Development, Docket No. 268062.

        Law Office of Salvatore Bellomo, LLC, attorneys for appellant (Salvatore Bellomo, on the brief).

        Matthew J. Platkin, Attorney General, attorney for respondent Board of Review (Donna Arons, Assistant Attorney General, of counsel; Andrew J. Sarrol, Deputy Attorney General, on the brief).

Respondent Genewiz, Inc. has not filed a brief.

PER CURIAM

Gabriel Jimenez appeals from the final agency decision of the Board of Review (Board), Department of Labor, affirming the Appeal Tribunal's determination he was liable to repay $12,240 in unemployment benefits he incorrectly received under the Unemployment Compensation Law, N.J.S.A. 43:21-1 to -71, and was ineligible for Pandemic Unemployment Assistance (PUA) benefits under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), 15 U.S.C. §§ 9001-9141. The record and applicable law support the Board's determination that Jimenez was disqualified for regular unemployment benefits because he quit his job voluntarily without good cause attributable to the work and was ineligible for PUA benefits because his unemployment was not a direct result of the COVID-19 pandemic. We therefore affirm.

I.

Jimenez worked as a genetic molecular technologist at Genewiz, Inc., a life sciences company, from August 2019 to February 2020. His job at Genewiz, which conducted genetic screening, involved handling "unknown DNA and

A-2964-21

RNA samples."[1]  Jimenez left his job on February 7, 2020, informing Genewiz "[he] was looking for work closer to home."

On July 26, during the COVID-19 pandemic, Jimenez filed a claim for unemployment benefits.  He subsequently received $12,240 in benefits for the weeks ending August 1, 2020 through May 1, 2021.  He stopped collecting unemployment benefits because he began a new job on May 5, 2021.

Almost three months after Jimenez's benefits ceased, the Deputy of the Division of Unemployment Insurance (Division) issued a Notice of Determination informing him:

> You left work voluntarily on [February 7, 2020].
>
> [B]ased on available information, you state that you voluntarily quit your job but did not provide a reason. There is no evidence that your separation is a qualifying reason identified under the [CARES] Act.  Therefore, you are ineligible for [PUA benefits].
>
> Therefore, your reason for leaving does not constitute good cause attributable to the work.  You are disqualified f[rom] benefits.

---

[1]  DNA and RNA stand for "deoxyribonucleic acid" and "ribonucleic acid," respectively. Steve Minchin and Julia Lodge, Understanding Biochemistry: Structure and Function of Nucleic Acids, 63 Essays in Biochemistry 433, 455 (2019).

A-2964-21

In addition, the Director of the Division of Unemployment and Disability Insurance directed Jimenez to repay $12,240 in improperly received benefits.

Jimenez responded, advising the Division that he quit his job at Genewiz primarily out of fear he would contract COVID-19 while handling molecular samples and infect his immunocompromised mother, with whom he lived. He further explained laboratory staff did not know prior to testing what the test samples contained.

Jimenez's response did not alter the Division's position, so he appealed to the Appeal Tribunal. During his Tribunal hearing, he testified that given his mother's weakened immune system, he "preemptively" quit his job because there was no effective treatment or vaccine for COVID-19 at the time. Genewiz provided staff gloves and lab coats but no masks at the time. He admitted he did not speak to his supervisors about his COVID-19 concerns, feeling it was unnecessary. He further testified he had already applied to another company when he left Genewiz, hoping to find a new job not involving testing unknown viral samples.

The Appeal Tribunal affirmed the Division's findings, stating "the evidence presented indicates [Jimenez's] fear of transmitting the virus to a loved one was a personal reason for leaving the job, as his departure . . . preceded the

4

onset of the pandemic and he failed to discuss his concerns with the employer so that reasonable precautions could be taken" to address his concerns. The Appeal Tribunal thus concluded Jimenez was disqualified for regular unemployment benefits, "as he left work voluntarily without good cause attributable to such work," N.J.S.A. 43:21-5(a), and ineligible for PUA benefits, because his "unemployment was not due to one of the COVID-19 related reasons identified in [the CARES Act, 15 U.S.C. § 9021](a)(3)(A)(ii)(I)."

The Board, with a slight modification, issued a decision affirming the reasons the Appeal Tribunal denied Jimenez benefits and ordered reimbursement of improperly received benefits. The Board added the dates that Jimenez was ineligible for PUA benefits.

II.

Before us, Jimenez repeats the arguments rejected by the Board. He contends he left his job for good cause attributable to the work because he was required to handle test samples without knowing whether they contained the COVID-19 virus. He feared contracting the virus might infect his mother, which, due to her preexisting health conditions, would have significantly increased her risk of death. Citing the Division's website, he claims the working conditions were so "unsafe, unhealthful, or dangerous" that he had to leave. He

A-2964-21

also argues he "quit his job as a direct result of COVID-19," which is one of the PUA-eligible reasons set forth in the CARES Act. See 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii). He maintains his unemployment is "a direct consequence of COVID-19 without intervening factors" because his only alternative to unemployment was "to [unknowingly] subject himself to COVID-19 samples." Jimenez argues forcing employees to delay quitting their jobs until they learn of their exposure to COVID-19 would undermine the CARES Act's purpose. Lastly, Jimenez argues that because the Division incorrectly determined he was ineligible for benefits, he is not liable to repay $12,240. We are unpersuaded.

A.

Under N.J.S.A. 43:21-5(a), employees who quit their jobs are disqualified for unemployment benefits unless they quit for "good cause attributable to" the work. "Good cause" means "cause sufficient to justify an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed." Brady v. Bd. of Rev., 152 N.J. 197, 214 (1997) (quoting Domenico v. Bd. of Rev., 192 N.J. Super. 284, 287 (App. Div. 1983)). An employee cannot rely on "imaginary, trifling[,] and whimsical" circumstances. Domenico, 192 N.J. Super. at 288. Rather, the employee must have "a reason related directly to

[their] employment, which was so compelling as to give [them] no choice but to leave the employment." N.J.A.C. 12:17-9.1(b). The employee bears the burden of showing good cause. N.J.A.C. 12:17-9.1(c).

Our review of the record convinces us that Jimenez failed to prove he left Genewiz for good cause attributable to the work. There is no evidence Jimenez should have received benefits "for voluntarily leaving work" due to "working conditions [that were] so unsafe, unhealthful, or dangerous as to constitute good cause attributable to such work." N.J.A.C. 12:17-9.4. His conclusory claims are insufficient. See Brown v. Bd. of Rev., 117 N.J. Super. 399, 404-05 (App. Div. 1971). He did not discuss his COVID-19 concerns with his supervisor or anyone in Genewiz's management. Instead, he "preemptively" quit his job without any medical directive that doing so would reduce his risk of infecting his mother. While we do not minimize Jimenez's concern, it appears "he left for personal reasons," which disqualifies him for benefits. Utley v. Bd. of Rev., 194 N.J. 534, 544 (2008).

Jimenez failed to "do what [was] necessary and reasonable . . . to remain employed." Condo v. Bd. of Rev., 158 N.J. Super. 172, 175 (App. Div. 1978). While good cause does not require an employee "to do 'everything possible to maintain intact the employer-employee relationship,'" id. at 175-76, the record

reflects that before quitting his job, Jimenez made no effort to keep his job at Genewiz by finding out if he would be handling COVID-19 samples or requesting protective equipment or safety precautions against exposure to the virus. Consequently, there is no reason to disturb the Board's decision as it was not arbitrary, capricious, or unreasonable; there was substantial credible evidence in the record to support it, and it was consistent with the enabling statute or legislative policy. Brady, 152 N.J. at 210-11.

B.

Congress enacted the CARES Act to provide federally funded PUA benefits to certain "covered individuals" who became unemployed for one of the COVID-19-related reasons listed in the statute but did not qualify for regular unemployment benefits during the pandemic. See Sullivan v. Bd. of Rev., 471 N.J. Super. 147, 153 (App. Div. 2022).

Jimenez contends he is entitled to PUA benefits under 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii) because to be covered, an "individual has quit his or her job as a direct result of COVID-19." This provision is misquoted. The statute reads, in pertinent part, "the individual has to quit his or her job as a direct result of COVID-19." 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii) (emphasis added).

While the CARES Act itself does not define "direct result," the Board pointed to federal regulations governing Disaster Unemployment Assistance, 20 C.F.R. §§ 625.1-.30, which defines "direct result" as "an immediate result of the major disaster itself, and not the result of a longer chain of events precipitated or exacerbated by the disaster." 20 C.F.R. § 625.5(c). The CARES Act incorporates these regulations by reference with the terms "COVID-19 public health emergency" and "pandemic" respectively substituted for "major disaster" and "disaster." 15 U.S.C. § 9021(h)(1)-(2). Accordingly, we interpret the phrase "direct result of COVID-19" to mean "an immediate result of the <u>COVID-19 public health emergency</u> itself, and not the result of a longer chain of events precipitated or exacerbated by the <u>pandemic</u>." <u>See</u> 20 C.F.R. § 625.5(c).

Based on the record before us, we are convinced Jimenez's situation does not qualify for PUA benefits under the CARES Act. Had he remained at Genewiz, any resulting COVID-19 exposure would have, at best, "precipitated or exacerbated" a "longer chain of events." <u>Id.</u> Jiminez's resignation was speculative: He feared he <u>might</u> be exposed to COVID-19 test samples, from which he <u>might</u> contract COVID-19 and thereby <u>might</u> infect his immunocompromised mother. Such speculation contravenes the examples set forth in 20 C.F.R. § 625.5(c)(1)-(3), illustrating an individual cannot work and

receive benefits because a disaster: (1) physically damaged or destroyed their workplace; (2) rendered their workplace physically inaccessible, or (3) caused a "lack of work" or "loss of revenues" to the individual's employer because the employer derived most of its revenue from an entity damaged or destroyed in the disaster or closed "in immediate response" to it. In each example, the disaster's mere occurrence caused unemployment. This was not the situation here, as Jiminez did not become unemployed simply because the COVID-19 pandemic occurred.

Furthermore, the record does not show Jimenez had to quit his job because of COVID-19. See 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii). Considering he did not express any COVID-19-related fears to Genewiz, there was no opportunity to accommodate his anxiety. Absent evidence the company would have denied accommodations, there is no reason to conclude the Board misapplied the CARES ACT in denying him PUA benefits.

## C.

The Board may seek full repayment of erroneously paid benefits as a matter of public interest, as payments to ineligible individuals deplete funds that might otherwise go to deserving future claimants. Bannan v. Bd. of Rev., 299 N.J. Super. 671, 674 (App. Div. 1997) (first citing Stauhs v. Bd. of Rev., 93 N.J.

Super. 451, 455 (App. Div. 1967); and then citing Zielenski v. Bd. of Rev., 85 N.J. Super. 46, 52 (App. Div. 1964)).

With respect to PUA benefits, federal laws require states that receive federal funding for unemployment benefits to establish procedures for recouping any improperly distributed benefits. 42 U.S.C. § 503(a)(9); see also Sullivan, 471 N.J. Super. at 155 (quoting 42 U.S.C. § 502). The federal regulations the CARES Act incorporated by reference, 15 U.S.C. § 9021(h), require state unemployment agencies to "recover for the account of the United States the total sum of" benefits paid to an ineligible recipient, 20 C.F.R. § 625.14(a).

We are cognizant of "the hardship many people . . . endured during the 2020 lockdown as a result of the COVID-19 pandemic." Sullivan, 471 N.J. Super. at 152. "No one could predict how long the pandemic would last." State v. Vega-Larregui, 246 N.J. 94, 136 (2021). With the benefit of hindsight, we now know COVID-19 spread very quickly, see In re City of Newark, 469 N.J. Super. 366, 385 (App. Div. 2021), and killed tens of thousands of people in New Jersey alone, N.J. Republican State Comm. v. Murphy, 243 N.J. 574, 582-83 (2020). Jimenez quit his job in early February 2020, as COVID-19 began spreading in the United States. See Legacy Church, Inc. v. Kunkel, 472 F. Supp.

3d 926, 938 (D.N.M. 2020). As he correctly notes, there was no COVID-19 vaccine or treatment then. See Murphy, 243 N.J. at 582.

We must not ignore the directives of the Legislature and Congress to recoup erroneously paid benefits. While the Division may waive recoupment when seeking a refund "would be patently contrary to the principles of equity," Jimenez has not requested a waiver. N.J.A.C. § 12:17-14.2(a)(3). Therefore, the Division was within its statutory authority to order Jimenez to repay the $12,240 in benefits he was not entitled to receive. Individuals who receive unemployment benefits while disqualified must "repay those benefits in full." N.J.S.A. 43:21-16(d)(1).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2964-21