74 A.3d 959

TOWNSHIP PHARMACY, PETITIONER–APPELLANT, v. DIVISION
OF MEDICAL ASSISTANCE AND HEALTH SERVICES,
RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 14, 2011—Decided August 22, 2013.

Before Judges FUENTES, GRAVES, and KOBLITZ.

*Mandel & Mandel* attorneys for appellant (*Matt D. Mandel,* on the brief).

*Paula T. Dow,* Attorney General, attorney for respondent (*Melissa H. Raksa,* Assistant Attorney General, of counsel; *Vicki A. Mangiaracina,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Township Pharmacy (Township) appeals from the decision of the director of the New Jersey Division of Medical Assistance and

Health Services (Director) denying its application to participate in the State's Medicaid program (Program) as a pharmaceutical service provider. The Director's decision was based on plaintiff's failure to disclose the criminal record of one of its employees. After reviewing the record before us, we affirm.

We hold that the Director correctly construed the disclosure requirements to enroll in the Program as a provider of health care, in this case pharmaceutical services. Here, plaintiff failed to perform basic due diligence before answering a question intended to disclose information material to a proper determination of an applicant's eligibility to participate in the Program. Although plaintiff did not intend to deceive or conceal this information, public policy supports the Director's determination that, under these circumstances, failure to provide accurate, truthful, and complete information constituted good cause to deny the application.

I

John Sclafani, a registered pharmacist since 1996, purchased Township in 2009. On February 12, 2010, Sclafani applied to the New Jersey Department of Human Services, Division of Medical Assistance and Health Services (Division), to enroll Township in the Program as a pharmaceutical services provider. The record shows that when Sclafani submitted the application, he did not know or have reason to suspect that B.L.R.,[1] a licensed pharmacy technician at Township, had a criminal record.

By letter dated August 12, 2010, the Medicaid Fraud Division informed Sclafani that Township's application was

being denied pursuant to *N.J.A.C.* 10:49–11.1(d)22 which states: "Any of the following, among other things, shall constitute good cause for suspension, debarment, or disqualification of a person engaged in State contracting, as defined herein, by the Medicaid Agent of Division of Medical Assistance and Health Services (DMAHS): Submission of a false or fraudulent application for the provider status to the program or its Fiscal Agent."

---

[1] We use initials to protect the privacy rights of this individual.

The disqualification letter explained that Sclafani did not disclose that B.L.R., an individual identified in the application as a "Pharmacy Technician," had a criminal history. Specifically, B.L.R. was charged in 1998 with fourth-degree stalking; she was arrested and charged in April 2004 with possession of oxycodone and fourth-degree simulating a false insurance identification card; she pleaded guilty in September 2004 on the charge of third-degree possession of oxycodone and was sentenced to three years probation; in June 2008, B.L.R. was charged with the disorderly persons offense of possession of less than fifty grams of marijuana and was ordered by a municipal court to pay a $375 fine. Based on this evidence, the Division found that Sclafani had given a "false" response to question 37 in the application and was therefore barred from participating in the Program pursuant to *N.J.A.C.* 10:49–11.1(d)(22).

Question 37 of the pharmaceutical provider application required Sclafani to answer the following query:

Have any of the persons or entities named in response to any questions in this application, or their officers, directors, shareholders, members, owners, employees or partners, or any of the individuals named in response to any questions in this application ever been indicted, arrested, charged, convicted of, or pled guilty or no contest to any federal or State crime or offense in this State or any other jurisdiction, even if this resulted in pre-trial intervention?

Sclafani placed an "X" next to the answer indicating "no."

By letter dated August 18, 2010, Sclafani's attorney contested the Division's denial of Township's application. Counsel informed the Division that B.L.R. had been employed at the pharmacy in various capacities since at least 2002. She was employed by Sclafani's predecessor when he purchased the pharmacy in 2004; Sclafani kept her on as an employee when he purchased the pharmacy in 2009.

Plaintiff's counsel further noted that, unlike disciplinary records kept by the State Board of Pharmacy, an employee's criminal record is not readily discoverable to a pharmacy owner/employer. Most significantly, Sclafani's attorney emphasized that, on May 14, 2009, approximately four months before his client purchased

Township, B.L.R. had been licensed by the Board of Pharmacy as a pharmacy technician. Thus, when Sclafani submitted the pharmacy's Medicaid provider application in February 12, 2010, he reasonably believed that B.L.R. did not have a criminal record or present any other legal impediment to Township's application. As further proof of his client's good faith, counsel concluded the letter by informing the Division that Sclafani was willing to terminate B.L.R.'s employment if necessary to assuage any lingering concerns the Division may have about her association with Township.

On August 23, 2010, Sclafani's counsel informed the Division that his client had decided to terminate B.L.R.'s employment. Counsel also included a copy of a letter written by B.L.R. to Sclafani, explaining the genesis of her brief criminal history. According to B.L.R., questions about her past legal indiscretions first arose in the context of her application to become a licensed pharmacy technician. The Board of Pharmacy accepted her explanation that her brief criminal involvement was based on events that occurred during a troubled period in her youth. She emphasized that her past missteps were not indicative of the person she had become.

B.L.R. thus asserted that a communication breakdown between two State bureaucracies—the Board of Pharmacy and the Medicaid Fraud Division—unfairly caused her to lose her job at Township. The following words from B.L.R. captured the essence of this moral conundrum in a far more direct fashion:

> If the Board of Pharmacy knew of my background and still approved me why am I getting fired over a denial of a Medicaid application? *Doesn't the Board of Pharmacy and Medicaid work together, how can one approve me then the other deny the pharmacy from being approved? It just does not make any sense.*
> [ (Emphasis added).]

## II

Unable to reach a suitable resolution with the Division, Sclafani requested that the case be transferred to the Office of Administrative Law (OAL) for an evidentiary hearing before an Administrative Law Judge (ALJ). *See N.J.S.A.* 52:14B–1 to –15; *N.J.S.A.* 52:14F–1 to –23. As framed by the ALJ, the Division contended

that pursuant, to *N.J.A.C.* 10:49–11.1(d)(22), it established "good cause" to deny plaintiff's application.

Sclafani testified that he purchased the pharmacy on December 3, 2009. He kept the employees that had been working for the seller, including B.L.R., who at the time had recently been licensed by the Board of Pharmacy as a pharmacy technician.

Although he purchased the pharmacy in December 2009, Sclafani did not file the pharmaceutical provider application until February 2010. In response to his attorney's question as to why he waited nearly three months to file the application, Sclafani responded that he was waiting for a number of legal issues to be resolved, including a physical inspection of the premises and review and approval of his record-keeping system by the Board of Pharmacy. Sclafani testified that he passed the inspection without any deficiencies.

Although Sclafani was an experienced pharmacist, this was the first time he owned his own pharmacy. Since becoming a registered pharmacist in 1996, he had worked for Walgreens Company (Walgreens) as a district supervisor for the northern region of the State and for several independent pharmacies. Based on his experience as a Walgreens manager, he was aware of the legal requirements to work as a pharmacy technician.

Sclafani testified that he was aware that "in order for [B.L.R.] to become licensed as a tech[nician] that she was going to have to be fingerprinted and undergo a criminal history, background check." [2] Sclafani also testified that all of his employees, including B.L.R., were aware that he was submitting an application to become a Medicaid provider. Despite this, Sclafani testified that B.L.R. never told him about her criminal background.

With respect to the pharmacy's professional staff, although he checked the internet to determine whether any of his licensed

---

[2] A copy of the Board of Pharmacy's online application to become a pharmacy technician was marked as an exhibit by plaintiff's attorney. Question 5 asked the applicant whether he or she had a criminal background.

employees had any past or pending disciplinary charges, Sclafani admitted that he did not conduct a criminal background check. He testified that he did not know how to conduct such a search and believed one "had to be a cop or a lawyer" to access this type of information. Furthermore, the application did not indicate how to conduct a criminal background check or whom to contact to initiate such a process.

On cross-examination, Sclafani admitted that, in the process of completing the application to become a Medicaid provider, he did not ask any of his employees whether they had a criminal history. He only asked them their dates of birth, social security numbers, and home addresses. He also conceded that he did not make any effort to ascertain how to conduct a criminal background search or attempt to access any public website that might have contained relevant information.

B.L.R. also testified before the ALJ. She started working at the pharmacy in 2000 as a cashier. When the pharmacy was sold the first time, the second owner paid her "to get [her] pharmacy tech[nician] license and then [she] moved up." She began to function as a pharmacy technician in 2002 "without being registered." B.L.R. candidly admitted: "I've been filling prescriptions without a license."

B.L.R. eventually submitted herself to a criminal background check as part of her application to the Board of Pharmacy to be registered as a pharmacy technician. This background check included fingerprints and submission of a formal application. Her application was approved three months later. B.L.R. testified that Joanne Boyer, R.Ph., the Board of Pharmacy's executive director in 2009, knew about her criminal background and told her that "if [she] need[ed] a reference for a job [Boyer] [would] give [her] one." [3]

---

[3] Boyer wrote a letter to B.L.R. dated May 14, 2009, congratulating her and confirming "that the New Jersey Board of Pharmacy ha[d] licensed [her] to practice as a Pharmacy Technician."

According to B.L.R., she and Boyer exchanged letters concerning B.L.R.'s criminal background during the time her application for a license as a pharmacy technician was pending before the Board of Pharmacy. B.L.R. testified that, as a result of her correspondence with Boyer, the Board of Pharmacy was fully aware of her criminal history when it issued her license to practice as a pharmacy technician.

B.L.R. also testified that she called Boyer after Sclafani fired her from Township, asking "how can ... [Township] be denied when [she] was approved?" When asked by plaintiff's attorney whether she ever told Sclafani about her criminal history, B.L.R. responded: "Like, why would I need to, for what? ... I didn't think I needed to.... [I]f I was approved by somebody why would I have to tell my personal business to everyone else? I don't get it."

On cross-examination by the Deputy Attorney General (DAG), B.L.R. clarified that the Board of Pharmacy discovered her criminal history when it conducted a background check in connection with her application to be licensed as a pharmacy technician. B.L.R. testified that, after she had submitted her application, a representative of the Board of Pharmacy wrote to her asking for an explanation as to the nature of the charges. On further questioning by the DAG, B.L.R. testified that her probation officer wrote a letter to Boyer explaining that B.L.R. "had nothing really to do" with her conviction for possession of oxycodone. Although the illicit drugs were found in her car, resulting in the temporary seizure of the vehicle, B.L.R. testified that she eventually "got [her] car back, because it wasn't [her] fault."

B.L.R. admitted to pleading guilty in 2003 to possession of oxycodone and simulating an insurance identification card, for which she was sentenced to three years probation. She also pleaded guilty in 2008 to a disorderly persons offense of possession of marijuana under fifty grams. Finally, B.L.R. testified that she had not been in trouble with the criminal justice system since 2008 and had never been disciplined by the Board of Pharmacy.

Cynthia White, an investigator with the Medicaid Fraud Division, was the first witness to testify at the administrative hearing. We have decided to describe her testimony last in the interest of clarity.[4] White is responsible to review provider applications and conduct background checks on the individuals involved. After reviewing the information and responses to questions provided by the applicant, she uses LexisNexis Group (Lexis), which, according to White, provides "complete background [and] gives information." White then uses Promis/Gavel, which White described as "public data information ... available in all the courthouses in all counties," at no charge to the public user.

White described how she used Promis/Gavel at the Mercer County Courthouse "and went to the criminal records," without having to show identification or identifying herself as a State investigator. When the DAG asked her to distinguish between Promis/Gavel and Lexis, White conceded that the latter is a private database that charges a fee to access and retrieve information. With respect to Lexis, White indicated that all she knew was that investigators use the program. She believed "a limited version of [Lexis] could be purchased for public use and sometimes that it will exclude ... the last four digits of the social security number," but her office paid "for the full version of [Lexis]."

White also used a program she described as the "Office of the Inspector General" (OIG) for "people who have been federally excluded ... [from] Medicaid and Medicare." She also looked at "the New Jersey debarment list, which shows ... [whether a] person [has] been debarred in the State of New Jersey from Medicaid." White did not know who maintains the debarment list.

---

[4] We note that this manner of presenting evidence to the ALJ is inconsistent with the basic principle that plaintiff bears the burden of establishing that the action taken by the Division in denying Township's application to participate in the Program was arbitrary, capricious, and unreasonable. *In re N.J.A.C. 7:1B–1.1*, 431 *N.J.Super.* 100, 116, 67 A.3d 621 (App.Div.2013) (citing *Williams v. Dep't of Human Servs.*, 116 *N.J.* 102, 107, 561 A.2d 244 (1989)).

She also used a program called "G-link," which she described as "an internal database which will show earnings, providers' name, address, previous owners [and] that sort of information." Finally, she occasionally uses "the Asbury Park Press database, which has a criminal conviction section that's accessible to anybody who has a computer and access to [the] internet."

According to White, she began her investigation with Lexis, Promis/Gavel, the OIG, the debarment list, G–Link, and something she described as "Accurint." Using Promis/Gavel, she discovered that B.L.R. "had various criminal charges and criminal convictions." She also saw B.L.R.'s name in the Asbury Park Press database that shows criminal convictions. According to White, "[t]hat resulted in a denial of the Provider Application." When asked to explain, White testified: "Because it was a false application. The information [contained] in that answer was not truthful and was not accurate and [the application] was denied pursuant to *N.J.A.C.* 10:49–11.1(d)(22)."

The DAG then asked White: "And, so what if somebody makes a mistake on the application, why is this so important?" In our view, this question raised issues of policy that this witness, as an investigator, was not competent to discuss or answer. Despite this, without objection from plaintiff's counsel, the ALJ permitted White to give the following answer:

> The individual who is applying to become a Medicaid provider is serving New Jersey's most vulnerable citizens which are Medicaid beneficiaries. And, it's the Office of the State Comptroller Medicaid Fraud Division's role to protect these individuals and to ensure that we have providers that are of the utmost integrity, who have the most integrity to provide services to our Medicaid beneficiaries.

Against this record, the ALJ found that, when Sclafani filed the application to be a Medicaid provider, he was required to answer all of the questions truthfully and accurately. Sclafani's answer to question 37 was indisputably false and inaccurate because B.L.R., his licensed pharmacy technician, had a criminal record. As a matter of credibility, the ALJ also found and accepted as credible the testimony provided by all of the witnesses. The ALJ thus found that Sclafani's omission

was not intentional or knowing, but rather was due to the failure of Sclafani to ask [B.L.R.] whether she had any criminal history; to the assumption of Sclafani that, because [B.L.R.] had just been licensed by the Board [of Pharmacy], he could conclude that she had no criminal history; to the lack of information provided in the application as to how to perform a criminal background check on another person; and to the assumption of [B.L.R.] that because she was licensed, she need not reveal her criminal history to Sclafani.

Based on these findings, the ALJ reviewed a number of administrative decisions that consistently held that, not withstanding a lack of intent to deceive or conceal, an applicant has a duty to provide truthful, accurate, and complete answers to all questions and supply all required information to ensure the integrity of the Medicaid Program.

The Director adopted the ALJ's findings and conclusions. The Director emphasized that, when Sclafani submitted the application for enrollment, he certified that "the information furnished on this application was true, accurate and complete." The Director noted that *N.J.A.C.* 10:49–11.1(d)(22) did not require an intent to deceive or conceal by the applicant. The regulation simply and straightforwardly required that the information be true and accurate. The Director determined that this higher standard was required "to preserve the integrity of the Medicaid program."

### III

We begin our analysis by reaffirming our limited scope of review. On appeal from a final agency determination, we can intervene only in those rare circumstances in which an agency action is arbitrary, capricious, or unreasonable. *Brady v. Bd. of Rev.*, 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997) (citing *In re Warren*, 117 *N.J.* 295, 296, 566 *A.*2d 534 (1989)), or are otherwise not supported by substantial credible evidence in the record, *N.J. Soc'y for the Prev. of Cruelty to Animals v. N.J. Dep't of Agric.*, 196 *N.J.* 366, 384–85, 955 *A.*2d 886 (2008) (citing *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980)). Under the arbitrary, capricious, and unreasonable standard, our scope of review is guided by three major inquiries: (1) whether the agency's decision conforms with relevant law; (2) whether the decision

is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion. *In re Stallworth,* 208 *N.J.* 182, 194, 26 *A.*3d 1059 (2011) (citing *In re Carter,* 191 *N.J.* 474, 482, 924 *A.*2d 525 (2007)).

If the agency decision satisfies these criteria, we are bound to give substantial deference to the agency's fact-finding and legal conclusions, while acknowledging the agency's " 'expertise and superior knowledge of a particular field.' " *Circus Liquors, Inc. v. Governing Body of Middletown Twp.,* 199 *N.J.* 1, 10, 970 *A.*2d 347 (2009) (quoting *Greenwood v. State Police Training Ctr.,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992)). We do not substitute our judgment for the agency's, even where we might have reached a different conclusion. *Stallworth, supra,* 208 *N.J.* at 194, 26 *A.*3d 1059.

Here, the Division falls within the New Jersey Department of Human Services and is responsible for the administration of the Program in this State. *N.J.S.A.* 30:4D–7. Under *N.J.S.A.* 30:4D–12(c), the Division is obligated to "[p]rescribe standards that providers must meet." A pharmacy wishing to participate in the Program as a provider must have a valid permit from the Board of Pharmacy and complete the Medicaid provider application. *N.J.A.C.* 10:49–3.2(a).

If an approved pharmacy is sold, the approval agreement is "automatically terminated." *N.J.A.C.* 10:51–1.2(b)(2)(i). Because the integrity of the Program is carefully monitored by the Division, in order to execute a new agreement to participate in the Program, a new owner must "apply to the Division of Medical Assistance and Health Services, Department of Human Services, by contacting the Provider Enrollment Unit." *Ibid.*

Here, the ALJ found (and the Director accepted) that Sclafani acted in good faith. The record shows that he made a good faith attempt to comply with the Division's regulations. Indeed, the ALJ found the two main actors in this case, Sclafani and B.L.R.,

credible. With respect to Sclafani, the ALJ accepted as reasonable his reliance on the Board of Pharmacy's then recent approval of B.L.R.'s license as a pharmacy technician as an indication that she did not have a criminal history. The ALJ also accepted B.L.R.'s license approval as the reason why Sclafani did not ask her directly about her past experiences. Finally, the ALJ accepted as credible Sclafani's testimony

about his lack of knowledge as to how to perform a criminal background check on his employees. He was not aware of the websites accessible to the public, as they were developed only recently, and he did not know that court information was available to anyone other than law enforcement personnel. He was genuinely surprised when advised that [B.L.R.] had a criminal history.

With respect to B.L.R., the ALJ also found credible her explanation of why she did not affirmatively disclose her past indiscretions to Sclafani. B.L.R. reasonably relied on the Board of Pharmacy's decision to issue her a license to work as a pharmacy technician, despite being aware of her criminal history.

In her factual summary, the ALJ found that Sclafani failed to include B.L.R.'s criminal history when answering question 37 of the application. She found that this omission by Sclafani was not knowing or intentional. Accordingly, the ALJ found that Sclafani did not include this information because: (1) he never asked B.L.R.; (2) he assumed she did not have a criminal history based on her recent receipt of a license by the Board of Pharmacy; (3) the application lacked information as to how to perform a criminal background check on another person; and (4) B.L.R. assumed that, because she was licensed, she did not have to reveal her criminal history.

After viewing a number of decisions in which the Director of the Division of Medical Assistance and Health Services interpreted the "good cause" provisions in *N.J.A.C.* 10:49–11.1(d), the ALJ concluded that good cause under *N.J.A.C.* 10:49–11.1(d)(22) constitutes submitting "false or fraudulent application for provider status to the Program or to its Fiscal Agent." As a matter of law, it did not matter that the applicant in this case had objectively

reasonable grounds to believe that the information he was submitting about his employee was accurate and truthful.

The Director accepted the ALJ's findings and conclusions in her Final Agency Decision. The Director noted that the Division has held in "numerous prior Initial and Final Agency Decisions [that] the regulatory good cause for denial of the application is based on the fact that a prospective provider has submitted a false or incorrect application." In the Director's view, "[t]he regulation does not require that the provider *intended* to deceive, manipulate, or defraud Medicaid, in order for the application to be denied."

We are sympathetic to plaintiff's predicament. The undisputed evidence presented to the Director established that plaintiff's failure to disclose the employee's criminal history was both inadvertent and based on a reasonable good faith belief that B.L.R.'s personal history had been recently reviewed and accepted by the Board of Pharmacy. As a licensed registered pharmacist in this State, Sclafani knew the professional requirements and legal responsibilities associated with being a licensed pharmacy technician.

However, we agree with the Director that the integrity of the Medicaid provider program demands scrupulous compliance with the disclosure requirements in *N.J.A.C.* 10:49–11.1(d)(22). The delivery of health care to the public is " 'a highly regulated business activity which directly impacts upon the safety and welfare of the public.' " *Open MRI of Morris & Essex, L.P. v. Frieri,* 405 *N.J.Super.* 576, 584, 966 *A.2d* 48 (App.Div.2009) (quoting *Material Damage Adj. Corp. v. Open MRI of Fairview,* 352 *N.J.Super.* 216, 227, 799 *A.2d* 731 (Law Div.2002)).

In this case, pharmacists are clearly part of this class of professionals who " 'are constructively on notice of the existence of legal requirements governing its practice and operations.' " *Ibid.* (quoting *Material Damage, supra,* 352 *N.J.Super.* at 227, 799 *A.2d* 731). Thus, " 'even a good faith belief that one is performing these services in a reasonable or otherwise sound manner is not a

defense.'" *Ibid.* (quoting *Material Damage, supra,* 352 *N.J.Super.* at 227, 799 *A.*2d 731).

■ We thus hold that an applicant's failure to fully and accurately disclose material information concerning an employee's criminal history constitutes "good cause" pursuant *N.J.A.C.* 10:49–11.1(d)(22) to deny a provider's application to become a Medicaid provider. This is so, even if the applicant's omission was caused by inadvertence and without the intent to deceive, mislead, or conceal. "'Sound public policy can accept no lesser standard.'" *Ibid.* (quoting *Material Damage, supra,* 352 *N.J.Super.* at 227, 799 *A.*2d 731).

Affirmed.