**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2885-17T1

D.N.,

     Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES, and AMERIGROUP,

     Respondents-Respondents.

_____

Submitted December 5, 2018 – Decided  October 4, 2019

Before Judges Fuentes, Accurso and Moynihan.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Disability Rights New Jersey, attorneys for appellant (August Lincoln Pozgay, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Division of Medical Assistance and Health Services (Melissa H. Raksa, Assistant Attorney General, of counsel; Marie Linette Soueid, Deputy Attorney General, on the brief).

Pringle Quinn Anzano, PC, attorney for respondent Amerigroup (Michael P. O'Connell, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Appellant D.N. is a thirty-eight-year-old man who was seriously injured in an automobile accident. His physical injuries caused quadriplegia. This means he cannot sit, stand, change positions on his own, or move his arms or legs. Consequently, he requires an in-house personal care assistant (PCA) to perform most of his day-to-day personal activities, such as hygienic grooming after biological functions, bathing, dressing, eating, drinking, and taking medications. As a medical imperative, D.N. also needs to be repositioned when he sleeps to avoid bedsores, maintain skin integrity that is subject to deterioration due to his incontinence and immobility, and prevent autonomic dysreflexia.[1]

---

[1] Lisa Rozycki, a Registered Nurse who testified at the evidentiary hearing conducted by an Administrative Law Judge, explained that "autonomic dysreflexia is the nervous system's overreaction to internal and external stimuli . . . racing the heart, fluctuation in the blood pressure, digestive issues, metabolic issues, [and] temperature dysregulation."

A-2885-17T1

D.N. is eligible to receive Medicaid assistance in the form of PCA services. He sought legal assistance from Disability Rights of New Jersey (DRNJ)[2] when Amerigroup, the Managed Care Organization (MCO) that functions as an agent of the Department of Human Services, Division of Medical Assistance and Health (Division), reduced the number of PCA services hours D.N. received from twenty-four hours per day, to fifteen hours per day. D.N. first challenged this reduction in PCA services through the internal administrative review process. After exhausting this internal administrative review, the Division transferred the case to the Office of Administrative Law to conduct an evidentiary hearing before an Administrative Law Judge (ALJ).

The hearing occurred on May 16, 2017. The first witness to testify at this hearing was Marie-Anna Bien-Aime, a Registered Nurse and Care Manager for Amerigroup. She became the Care Manger for D.N. in 2015. Her most recent contact with D.N. was in February 2017. Amerigroup relies on a "tool" Bien-Aime identified as "Activities of Daily Living" (ADL) to assess the level and type of PCA services a disabled person needs to function outside a nursing

_____

[2] Disability Rights of New Jersey (DRNJ) "is a private, non-profit, consumer-directed organization established [in part] to advocate for and advance the human, civil and legal rights of citizens of New Jersey with disabilities." https://www.drnj.org/ (Last visited on September 24, 2019).

home. Bien-Aime testified these activities include "washing your face, brushing your teeth, getting washed, dressed, getting out of bed, [and] meals . . . [.] If . . . the person is incontinent or has no control of their bowel and bladder and they need assistance . . . that would be part of it also."

The first "category" under the ADL is denoted as "ambulation," which Bien-Aime explained in D.N.'s case "would be how he gets around from room to room or how he basically ambulates by using his [electrically powered] wheelchair." Although the wheelchair enables D.N. to move around independently, based on "conversations" she had with D.N., Bien-Aime learned "he does need . . . hands-on assistance or somebody else helping him around."

When Amerigroup's counsel asked Bien-Aime "what score" she gave D.N. on "ambulation," she responded: "[B]ased on the number of minutes it takes to perform the activity over a 24 hour period . . . I give him, '30 minutes,' per day which actually is the maximum allowed per the tool." This amounts to 210 minutes or three and one half hours per week.

The next "category" is "transfer," which Bien-Aime explains involves "how to get the member from one place to another." D.N. uses a "Hoyer Lift" to transfer from the bed to the wheelchair. Bien-Aime testified that in D.N's case, this takes approximately one hour. She "allow[ed]" him ninety minutes

4

per day under the assumption D.N. would transfer in this fashion only twice per day "because it's a transfer out of bed in the morning and then again <u>it</u> has to be done in the evening." (emphasis added). This amounted to 630 minutes per week.

Bien-Aime defined the category denoted as "bathing" to encompass "washing the member from head to toe." In D.N.'s case, he gets "bed baths," which "take at least an hour . . . which amount[s] to '420 minutes' per week." Without reference to how much time the ADL allotted for this kind of personal grooming activity, Amerigroup's counsel asked Bien-Aime: "So he explained to you that it takes an hour and <u>you gave the full hour</u>[?]" (emphasis added). She responded: "I gave him the full hour." The category of "Feeding/Eating" involves assisting D.N. "to actually put the food in his mouth and allow him to eat." Bien-Aime "gave him, '45 minutes' . . . for a total of, '1,575'" per week. In response to Amerigroup's counsel's question, Bien-Aime clarified that "Eating/Feeding" does not include the preparation of meals, which falls under a housekeeping category denoted "Instrumental."

The category denoted "Positioning" refers to propping D.N. up and down or turning him side to side, if he is in bed; and adjusting his position and shifting his weight if he is sitting in the wheelchair. D.N requires "somebody to

physically help him."  Bien-Aime  actually "gave" him "50" minutes per day "based on the calculations again that it's '5 minutes,' per episode, and there is a limit of 6 but I did give him higher because he does need to be repositioned from side to side if he's in bed so it amounts to '350 minutes,' a week."

Amerigroup's counsel prefaced his question about the category "Toileting" by saying: "I think we all have a pretty common sense understanding of that but could you give a brief explanation and the minutes allotted?"  Bien-Aime's response revealed how complex and medically fragile this "common sense" human experience is for both D.N. and the PCAs assigned to him on a regular basis:

> In [D.N.'s] case he does have a Foley Catheter which . . . allows the urine to drain into a bag that has to be emptied basically on a regular basis.  He is - - he does get a bowel program and the nurse does go in three times a week, however, in between he may have accidents and need to be changed due to a bowel movement, so I gave him, "50 minutes," for a total of, "350" [minutes] a week.

Unfazed by his previous failure to appreciate the magnitude of the challenges D.N. faces on a daily basis, counsel introduced the category denoted Personal Hygiene and Grooming as follows:

> Q.  . . . Again, I'm thinking it's pretty self-explanatory but if you could explain it to the [c]ourt and tell us what numbers you gave?

6

> A. Sure.  Personal Hygiene and Grooming[,] it says here, "Brushing the hair, shaving, brushing teeth, nail care," and [D.N] does need assistance for that and I gave  - - I allowed, "60 minutes", for a total of, "420 minutes," a week.

Dressing and Adaptive Equipment requires the PAC to clothe D.N. "from head to toe" and apply any equipment he may need to wear as a matter of medical necessity, such as braces or splints.  Bien-Aime allowed "60 minutes" for a total of 420 minutes a week.  D.N. also requires, and is eligible to receive, "Instrumental Activities for Daily Living" (IADL).  These services cover an array of personal activities by the PCA, such as housekeeping, laundry, food shopping, and accompanying D.N. to physician appointments.  The maximum number of minutes Amerigroup allows for these services is 120 minutes per week.

There is also a separate category for "Soiled Bed Linen Changes" that covers the need to change linens more frequently due to D.N.'s medical condition and physical limitations, which cause him to perspire profusely; there are also "accidents while changing the Foley Catheter."  Bien-Aime testified that based on her assessment, housekeeping services change bedlinens an average of four times per week.  Amerigroup allows a total of 120 minutes per week for all of these services.

7

Bien-Aime testified that based on the number and kind of services D.N. required, her assessment indicated he was only entitled to a total of eighty-eight hours per week. However, he received 105 hours per week. According to Bien-Aime, D.N. was receiving 105 hours per week when she took over this case. D.N. was sharing his apartment with a roommate who was also receiving PCA hours. They combined their PCA services to have a Home Health Aide in the home on a twenty-four-hour basis. Unfortunately, D.N.'s roommate became ill and was forced to move out of the apartment.

At D.N.'s request, Bien-Aime discussed the situation with her manager and Amerigroup agreed to continue to provide PCA services to D.N. on a twenty-four-hour basis pending the roommate's return. When it became clear that the roommate would not return, Bien-Aime suggested to D.N. to find another roommate. She also made clear that Amerigroup would only provide him with twenty-four-hour PCA services for three more months. When D.N. was unable to find another roommate at the end of the three-month period, Amerigroup reduced his PCA services to 105 hours per week.

On cross-examination, Bien-Aime conceded that the number of hours she attributed to each of the categories of personal services she described on direct examination were merely "guidelines." In fact, the tool she used to derive the

number of hours expressly stated: "If the member requires more or less time, place the required time in the box and write an explanation why."  She also testified she was allowed to exceed the guidelines.  With respect to D.N.'s "positioning" requirements, Bien-Aime conceded that he requires "frequent repositioning to prevent skin breakdown."  Thus, without a PCA, D.N. is in bed completely immoveable during the entire night.  Bien-Aime also clarified that she did not allot D.N. any time under the IADL for someone to accompany him to an appointment with a physician.

Ann Basil had been employed by Amerigroup for three years at the time she testified at this hearing.  She managed two service teams for Amerigroup: the Behavioral Health Social Workers and the Field Nurses.  These teams are part of the Managed Long Term Services and Supports Program (MLTSSP).  Her responsibilities included overseeing the Morris and Union Counties Field Care Management Teams and the Teams were personally responsible for D.N.'s case.  Basil corroborated Bien-Aime's testimony concerning the history of the case and the efforts Amerigroup made to work out a suitable arrangement with him.

Individuals who need twenty-four-hour care and want to reside outside a nursing home are responsible to make their own arrangement with family members or friends.  According to Basil: "It's in our contract and it's always

9

expressed to the members [that] the expectation is that they have their own arrangements for those hours and that the MLSTSS Program could not provide 24 hour care in the community." When Amerigroup's counsel asked her to elaborate on this contractual arrangement, Basil explained that this type of arrangement relates to "[t]he contract that . . . all the MCOs, all Managed Care Organizations, have with the State of New Jersey for Medicaid recipients."

Basil identified the contract, which was admitted into evidence as a respondent's exhibit, and focused on the language in Article 9 which states, in relevant part:

> During the IDT process, the member's needs are identified as well as the caregiver support identified to meet the community placement needs. Members are counseled on the program's inability to provide 24 hour care and advised that the total Private Duty Nursing Personal Care Assistance, and Self Direction total services limit is 16 hours per day. This is in accordance with N.J.A.C. 10:60-6.3 (b) (2) which indicates that a live-in primary adult caregiver who accepts 24 hour responsibility for the health and welfare of the beneficiary and is required to provide a minimum of eight (8) hours of hands on care daily.

Basil acknowledged that Amerigroup has "members that need 24 hours a day, a lot." However, with the exception of D.N, she was not aware of any other member who received this level of service. She explained that the twenty-four-hour PCA service provided to D.N. when his roommate became ill was "an

exception done in an emergency." This temporary measure was intended to last only "[u]ntil his roommate came out of the hospital and they said it would be reassessed upon his return . . . if he did not return then they would reassess in six months." Although they explored other options, such as finding another roommate or arranging for a family member to stay with D.N., they were unable to find a solution.

On cross-examination, D.N.'s counsel asked Basil to read into the record the following part of the contract Amerigroup has with the Division:

> If the member's LTSS[3] costs in a community setting exceed the costs of an institutional placement setting, but fall within the Annual Cost Threshold, the MCO [Amerigroup] shall be required to provide the services in the member's preferred placement setting. If the member's LTSS costs in a community setting exceed the costs of an institutional placement setting and exceed the Annual Cost Threshold, then the MCO shall follow the Cost Effectiveness processes outlined within this section including evaluation for an exception.
>
> [(emphasis added).]

D.N.'s counsel asked Basil if this section of the contract required Amerigroup "to provide services in the member's preferred setting." Basil provided the following response:

---

[3] LTSS is an initialism for "Long Term Services and Support."

11

Incorrect, we're required to go to an IDT [Interdisciplinary Team] if the hours exceed 16 hours as well. So we're required to go to an IDT if there is any discussion of that, the hours plus also the cost, so both are taken into consideration.

Basil conceded that the decision reached by the IDT to deny D.N. twenty-four-hour PCA service constituted "a reduction in services." Furthermore, Dr. Anthony-Wilson, an Amerigroup Medical Director who was not involved in the IDT process, made the final determination to reduce D.N.'s services. The letter signed by Dr. Anthony-Wilson does not cite to any provision in the contract Amerigroup has with the Division to support her decision to reduce D.N.'s PCA services. Dr. Anthony-Wilson makes clear that Amerigroup relied only on the "New Jersey PCA Beneficiary Assessment Tool" to reach this decision. This is the same "tool" RN Bien-Aime discussed at length.

The letter Amerigroup sent D.N. informing him of its decision to reduce his PCA services was signed by Ann Gavin, whom Basil identified as the Manager of the Quality Department, not the Medical Director who made the decision. Although the letter was not admitted into evidence, Basil read into the record the following passage: "The reason for upholding this action is [that] the member[-]appeals panel met today to discuss the appeals. The member is currently approved for 105 [hours per week] and there was no clinical

information provided to indicate why the member requires 24 hours of PCA."

(emphasis added).

Basil also testified that the IDT group that reviewed D.N.'s request for twenty-four-hour PCA services also considered the "monetary values." The following testimony clarifies this issue:

> Q. Ms. Basil, I'm showing you what's been marked as Petitioner's . . . P-4, for the record. Is it safe to say this is your note following an IDT call held on "August 16, 2016," regarding [D.N.]?
>
> A. Correct.
>
> Q. In your note you mentioned . . . some monetary values. Is that correct?
>
> A. Yes, we are required to indicate in the note what the cost threshold is.
>
> Q. And the cost threshold is not 85 percent but 100 percent. Is that correct?
>
> A. Correct, our State contract requires that we go to an IDT when anyone is over 85 percent of the contract . . . amount.
>
> Q. So during this meeting your note says that the current threshold . . . the current cost for [D.N.] was, "$135,144.88 per year." Is that correct?
>
> A. Correct.
>
> Q. And that amount is over the 85 percent limit. Is that correct?

A-2885-17T1

A. Correct.

Q. But it's under the 100 percent limit for the threshold. Is that correct?

A. Yeah, correct.

Q. So, it costs less than the annual threshold for [D.N.] to receive the services in the community. Is that correct?

A. Yeah, correct. We're required to go to an IDT when they're over 85 percent but it's under 100 percent.

Counsel next asked Basil to explain the concept of "capitation" or "capitated rate" and specifically address what role it played in Amerigroup's decision to deny D.N.'s request for twenty-four-hour PCA services. Although Basil said she does not work in the "department," she agreed with D.N.'s counsel that capitated rate "means that the State pays a certain amount of money to manage an individual's care." This prompted the following exchange:

Q. You wrote in your note that, "The dual SCNF of 85 percent is $135,885.87." Is that correct?

A. Correct.

Q. And so 85 percent of the cost threshold for somebody who is Dual S-C-N-F is that amount of money. Is that correct?

A. Correct. "SCNF" stands for a Specialty Care Nursing Facility level of care.

14

Q. And [D.N.] meets that level of care. Correct?

A. Correct, it's been approved by OCCO which is the Officer of Community Choice Options.

Against this backdrop, Basil agreed that: (1) the contract between Amerigroup and the Division provides: "If the member's LTSS costs in a community setting exceed the costs of an institutional placement setting[,] but fall within the [A]nnual [C]ost [T]hreshold, the MCO <u>shall be required to provide the services in the member's preferred placement setting</u>[,]" and (2) the $135,885.87 cost of keeping D.N. in the community is less than the annual threshold cost. (emphasis added). In light of these two material concessions, D.N.'s counsel asked Basil:

Q. [D.N.'s] amount that was discussed on the IDT call was less than the annual threshold. Correct?

A. That's correct, but that still doesn't mean that we're excluded from following the rule that we had discussed before as far as the number of hours per day.

Q. So it's safe to say that there are multiple sections in the contract that could apply to this. Correct?

A. Correct.

D.N. called Lisa Rozycki, a Registered Nurse with twenty-four years of experience and a specialty in Home Care and Geriatrics. At the time she testified before the ALJ, Rozycki was most recently employed by the Carrier Clinic as

15

the Director of Geriatric Services in the psychiatric hospital. She has also been admitted as an expert witness in over thirty litigated cases. The ALJ admitted Rozycki as an expert witness in the field of Nursing Assessment and in Nursing Care.

Rozycki described D.N.'s physical limitations and condition. She testified that D.N.'s physician ordered that D.N. be "wheelchair bound for no more than six to ten hours per day . . . and then otherwise is bed bound the remainder of the day." Rozycki corroborated Bien-Aime's testimony in her description of the arduous, time-consuming tasks performed by a PCA on a daily basis to ensure D.N.'s safety, to enable him to remain in the community, and to provide him a reasonable degree of mobility.

However, Rozycki's testimony differed from Bien-Aime's tool-based analysis in a number of key areas. For example, Rozycki testified that nursing standards for incontinence care requires that "an individual who is incontinent should be . . . checked and changed . . . every two to three hours." She also emphasized that a person with D.N.'s vulnerability to autonomic dysreflexia requires that he be checked on and changed every two to three hours, on a twenty-four-hour schedule. D.N.'s counsel moved Rozycki's report on this subject into evidence.

16                                                                                          A-2885-17T1

Rozycki also testified concerning the monitoring duties of a PCA. One of the most important duties of a PCA involves monitoring the urine bag. She explained that "the leg side bag doesn't have the ability to hold that much urine and it has to be emptied quite frequently . . . approximately every two hours . . . given the amount of fluids he's taking in." This monitoring duty and evacuation function must continue throughout the twenty-four hours of the day "because you don't want it to be pulling on the skin." This pulling has "the potential to deflate or dislodge the balloon that's internally holding it in position."

There are also concerns related to D.N.'s catheter. Rozycki testified that D.N. told her he had been having "an issue with the blockage." If the person using a catheter does not get enough fluids or develops infections, sedimentations may cause a blockage. Rozycki explained that "epithelial cells that are floating around [the] bladder wall . . . can cause a blockage in the opening to the catheter that sits in your bladder." This can trigger D.N.'s autonomic dysreflexia, which may lead to blood pressure fluctuation, causing a change in the heart rate, profuse perspiration, and intense pain due to his inability to urinate.

17

A PCA is not trained to deal with these medical issues. A visiting nurse must respond to D.N.'s residence "to manage the issue and that means flushing the catheter" with the goal taking care of the problem on site. If the nurse is unable to perform this procedure safely at D.N.'s residence, he must go to the nearest emergency room. According to Rozycki, "the week before, [D.N.] had to go to the ER and have it taken care of by a professional . . . [.]" Rozycki testified this event exemplifies the need for a twenty-four-hour PCA.

D.N. was the last witness to testify before the ALJ. He described the 2001 accident that caused his current medical condition, the type of daily, lengthy list of personal services the PCA provides him, and the needs that remain unattended when the PCA is not with him. For example, D.N. testified he would be unable to summon help: "[If] I have . . . a bowel movement or a catheter leakage or if I'm just not feeling well . . . if I'm hot or overheated." His bowel movements are not under his control. He explained: "A nurse comes three days a week and . . . puts in a suppository and does the bowel program." From his nourishment to his grooming, from his movement to his rest, he is completely dependent on others to perform the most basic of human functions.

At the time of this hearing, D.N. had more than one PCA that worked on different shifts, including overnight shifts. The overnight PCA repositions him

18

in the bed, drains the urine bag, fills his cup of water, takes off the blanket if he is warm or puts one on if he is cold, and places ice packs on the top of his head. D.N. testified: "I just don't sleep well at all, I just . . . never did."  This prompted the following questions from his attorney:

Q. How often do you have difficulty sleeping?

A. Pretty much nightly.

Q. Are there times where you awake in the middle of the night when you need assistance?

A. Yes.

Q. With what do you need assistance when you're awake?

A. Sometimes I'll be uncomfortable and need to be repositioned, I'll be getting pain whether it's my shoulders from laying on one side too long.  Sometimes it's due to the catheter being blocked or sometimes even I get the sensation where I have to go to the - - like whether the catheter is blocked or my bowels are moving, so I'll call for them to put like a Chux pad underneath my backside or to check the catheter to see if the catheter is going and if it's not they'll elevate my head because I can't do that on my own.

So they elevate my head and they'll put the ice pack on my head and call the nurse - - they'll call the VNA Nurse.  They move the catheter around to see if the blockage can come - - can move on its own.  If not, then they'll call the VNA Nurse and the VNA will send a nurse and if she can't rectify the problem, then they'll have to call the ambulance.

19                                                                    A-2885-17T1

In his Initial Decision, the ALJ framed the issue before him as "whether 105 hours of PCA services [per week] is appropriate [.]" The ALJ found that Medicaid and Amerigroup meet with individuals who satisfy Medicaid financial requirements like D.N. Each individual is assessed by an Interdisciplinary Team (IDT) to determine whether they are eligible for PCA services. The ALJ found the IDT advised D.N. that "the total Private Duty Nursing, Personal Care Assistance, and Self Direction total services limit is sixteen hours per day." The ALJ ultimately concluded that D.N. was "fortunate to have [had] a roommate for a period of time who shared his aide so that care was around-the-clock, and who also was able to assist [him]."

The Division Director adopted the ALJ's Initial Decision. Citing N.J.A.C. 10:60-3.8(c), the Director held: "If the necessary personal care and household tasks can be accomplished within 105 hours per week, any additional hours would only be used for supervision or companionship which is not an authorized use of the service." The Director concluded her Final Decision by emphasizing that providing D.N. twenty-four-hours assistance under these circumstances "would be contrary to the purpose of the PCA program, which is intended to provide medically necessary assistance with specific health related tasks."

This court reviews a final quasi-judicial decision of a State administrative agency "under an arbitrary and capricious standard." Zimmerman v. Sussex Cty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). Thus:

> our scope of review is guided by three major inquiries: (l) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion.
>
> [Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283-84 (App. Div. 2013) (citing In re Stallworth, 208 N.J. 182, 194 (2011)).]

Guided by these well-settled principles of administrative law jurisprudence, and mindful of the Director's own declaration that the underlying purpose of the PCA program "is to provide medically necessary assistance with specific health related tasks," we conclude the Director's decision to deny D.N. twenty-four-hour per day PCA services was arbitrary, capricious, and not supported by the evidence in this case. The record shows D.N. established that he needs twenty-four-hours of PCA services based exclusively on his indisputable medical fragility and complete inability to perform the most basic functions without assistance from a PCA.

21

D.N. resided in a nursing home before he moved into an apartment in the community with a roommate who was also eligible to receive Medicaid funded PCA services. At the time D.N. moved into the apartment, he was receiving fifteen hours per day of PCA services provided by Horizon Blue Cross and Blue Shield, the Managed Care Organization (MCO) predecessor to Amerigroup. Although his roommate received up to seven hours per day of PCA services, D.N. testified that this did not prevent the roommate from performing household tasks such as cooking and assisting D.N. in a personal way, such as eating, emptying his urine drainage bag, and "a lot more."

The bureaucratic matrix relied on by Amerigroup to determine whether D.N. needs twenty-four-hour assistance is untethered to the reality of his physical limitations and the serious potential health hazards he faces on a daily basis. Basic humanity and common sense dictate that a person utterly incapable of movement and connected to medical devices to perform rudimentary biological functions cannot be left alone in an apartment. The testimony of the representatives of Amerigroup seem oblivious to this reality.

Amerigroup now spends $135,144.88 per year to provide D.N. only 105 hours per week of PCA services. Amerigroup's representative conceded that pursuant to the contract Amerigroup has with the State: "If the member's LTSS

costs in a community setting exceed the costs of an institutional placement setting, but fall within the Annual Cost Threshold, the MCO <u>shall be required to provide the services in the member's preferred placement setting</u>." (emphasis added). The current 105 hours per week arrangement is under the 100 percent limit for the threshold allowed under the contract. There are sufficient funds to provide D.N. with twenty-four-hour PCA service without exceeding the Medicaid contractual limit.

The Division Director held that the PCA program is intended to provide medically necessary assistance for specific health related tasks. The denial of twenty-four-hour PCA assistance to D.N. in this case is utterly inconsistent with the purpose of the PCA program. But more importantly, it is irreconcilable with any notion of basic human decency.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2885-17T1