**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3859-19

DAVID KENT,

     Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR,
and 360 FIRE PREVENTION,
LLC,

     Respondents.

_____

          Submitted May 17, 2021 – Decided June 16, 2021

          Before Judges Sabatino and Gooden Brown.

          On appeal from the Board of Review, Department of Labor, Docket No. 203,408.

          David Kent, appellant pro se.

          Gurbir S. Grewal, Attorney General, attorney for respondent Board of Review (Donna Arons, Assistant Attorney General, of counsel; Christopher Hamner, Deputy Attorney General, on the brief).

PER CURIAM

David Kent appeals from the April 30, 2020 final agency decision of the Board of Review upholding his disqualification for benefits under N.J.S.A. 43:21-5(b) on the ground that he was discharged from employment for misconduct connected with the work. Based on our review of the record in light of the applicable legal principles, we vacate the decision and remand for further proceedings.

We glean these facts from the record. Kent commenced employment as a delivery driver for 360 Fire Prevention, LLC in October 2018. After he was discharged on December 16, 2019, he filed a claim for unemployment benefits. On January 15, 2020, a Division of Unemployment Insurance Deputy determined that Kent was "eligible for benefits from [December 22, 2019]." The January 15 Notice of Determination informed Kent:

> You were discharged from your position at 360 Fire Prevention on [December 16, 2019] for insubordination and verbal abuse. There is insufficient evidence to support this allegation.
>
> Your actions do not constitute a willful and deliberate disregard of the standards of behavior your employer had a right to expect therefore, your discharge was not for misconduct connected with the work.

On January 21, 2020, the employer appealed, contending that Kent "was discharged for reasons which constitute misconduct in connection with the

work."  On February 3, 2020, an appeals examiner mailed Kent a Notice of Phone Hearing, scheduling the hearing for 9:00 a.m. on February 20, 2020, and explaining that "all evidence should be received by the Appeal Tribunal no later than [twenty-four] business hours prior to the scheduled hearing date and time." Although the notice included a phone number, fax number, and mailing address, no email address was supplied.  On February 17, 2020, Kent sent a document notifying the examiner that he had "audio evidence" he wanted "to submit . . . prior to the hearing" and "tried calling to get an email but was unable" to reach the examiner.[1]

At the telephonic hearing conducted by the Appeal Tribunal on February 20, the evidence presented centered on the circumstances surrounding Kent's discharge on December 16, 2019.  During the hearing, Charles Musumeci, Jr., President of the company, and C.J. Musumeci, Vice-President of the company and one of Kent's supervisors, testified for the employer.  Kent and his brother James testified on Kent's behalf.  There was no discussion about the audio evidence Kent had attempted to submit.

---

[1]  Kent later indicated that he "mailed two audio CDs to the Appeals examiner prior to the hearing" once he was unable to obtain an email address.

During the hearing, Charles testified that an "investigation" revealed that during Kent's employment as a driver, Kent "was constantly speeding," "not following protocol," "not fulfilling his responsibilities," and "lying about his location and what he was doing." A few days before December 16, Charles learned that Kent had "spent five hours at his home with . . . the company vehicle running," "disconnected . . . the vehicle locating device," and lied about his whereabouts.

According to Charles, although he was perturbed by these revelations and planned to discuss them with Kent, "there was a possibility of [Kent] getting another chance." However, Kent "assumed . . . he was going to get fired due to . . . his actions . . . from a few days before." As a result, on December 16, when Kent "was off from work," Kent "walked into . . . C.J.['s] . . . office" with his brother and "started to scream at the top of his lungs to the point where he disturbed the entire internal portion of the office." Due to the disturbance, Kent "was asked . . . to go outside."

Once outside, Kent "walked . . . within an inch [of Charles's face], screaming, . . . flexing, . . . threatening, and yelling out of control like an animal." Kent demanded to know "why" he was "being fired" and "who[ was] firing [him]." Believing that Kent was "going to get violent," Charles asked

Kent "to calm down" "three or four times," to no avail. Finally, Charles told Kent that he was fired and told the onlookers, including C.J., to call the police. At that point, Kent "backed down a little, got in his car, . . . started yelling at his brother," and "left within minutes of the police being called."

Charles testified that the confrontation "was actually very scary." When asked by the examiner whether Kent would have been fired if the confrontation had not occurred, Charles equivocated but ultimately admitted that "he probably . . . would have been fired anyway."

C.J. testified that Kent was fired because "during the work day," he "took the [company] vehicle home, and spent time there . . . and did not inform [them] as to his location." Although C.J. did not "personally . . . speak to [Kent]" about the issues with his work performance, he "believe[d]" that it had been addressed by either Charles or another one of Kent's supervisors.

Regarding the December 16 incident, C.J. testified that, accompanied by his brother, Kent "walked right into [C.J.'s personal] office . . . without permission," "started yelling . . . and was very loud and confrontational about the whole situation." Although Kent had not yet been fired, when C.J. "walked [him] outside," Kent continued "screaming" and "yelling" "about why he was fired." C.J. testified that he "just tried to calm [Kent] down" "until [Charles]

5

arrived," at which point Kent directed his rants towards Charles until Charles actually fired him.

Kent disputed the employer's testimony concerning the December 16 encounter and his performance with the company.  According to Kent, two days earlier, when his brother who worked for the same company "gave notice that he was taking a new job," his brother was informed "that they were going to let [Kent] go."  Although Kent was not scheduled to work on December 16, he drove to the workplace with his brother and, while there, asked C.J. "why [he] was getting fired."  Kent testified that although he "wasn't happy about the situation," he "wasn't yelling and screaming."  In response to Kent's question about why he was being fired, C.J. "didn't elaborate too much" so Kent waited for Charles to arrive.

According to Kent, as soon as Charles arrived, the "first words" out of Charles's mouth were "[y]ou're terminated."  When Kent asked for a reason, Charles responded "it didn't matter."  When Kent tried to reason with him, Charles "threatened to call the cops" so Kent eventually left to avoid getting arrested.  Kent acknowledged that after "[he] was actually terminated," he became angry and "may have raised [his] voice."  However, he denied "threaten[ing Charles]" or doing "anything like that."  Kent also acknowledged

6

"taking a lunch [break]" at his home with the company van and explained that the "GPS" was disconnected because of "a problem with the vehicle." However, he denied being questioned about any issues with his work and denied lying about his whereabouts.

James confirmed that when he resigned to take "another job offer from a different company," Charles told him during his exit interview that he had already made a decision "to fire [Kent]" and James's resignation "actually made it easier for [him]." Charles explained to James that he was firing Kent because he had "unplugged . . . the [GPS] . . . in the van," and "went home at lunch numerous times and lied . . . about it."

James testified that when he relayed the information to Kent, Kent became "a little upset." James acknowledged that during the December 16 encounter, Kent became "loud" after Charles fired him. However, according to James, Kent was not "threatening." Instead, Kent tried to respond to their accusations regarding him "unplugging the [GPS]" but "they really didn't want to hear it." After Charles threatened to call the police, he and Kent "packed up and . . . left."

The Appeal Tribunal reversed the Deputy. In its February 20, 2020 written decision, the Appeal Tribunal determined:

> In this matter, [Kent] was discharged for insubordination, yelling and being confrontational with

the employer. Here, [Kent] contends that he did not yell and threaten the employer on [December 16, 2019]. [Kent's] contention is not found to be credible in light of the employer's testimony that [Kent] was yelling and confrontational about why he was terminated and is given more weight as it is likely that [Kent] was upset over being told that he was going to be terminated by another party other than the employer and the employer had not made the decision to terminate [Kent] at that time. Hence, [Kent's] actions in being insubordinate and yelling and being confrontational with the employer shows a disregard of the employer's interest, and a disregard of the standards of behavior which the employer had the right to expect of his employees and the discharge was for misconduct connected with the work and [Kent] is disqualified for benefits under N.J.S.A. 34:21-5(b) as of [December 15, 2019] through [January 25, 2020].

On February 24, 2020, Kent appealed to the Board disputing the facts supplied by his employer and urging the Board to review the audio files from the December 16 incident that were included with Kent's appeal. In its April 30, 2020 decision, the Board affirmed the Appeal Tribunal "[o]n the basis of the record below." The Board explained that "there [was] no valid ground for a further hearing" because Kent "was given a full and impartial hearing and a complete opportunity to offer any and all evidence."

On July 9, 2020, Kent filed this ensuing appeal. On March 15, 2021, we granted Kent's motion to supplement the record with the audio recordings of the December 16 incident and Kent's certified driver's abstract showing that he did

not receive any moving violations while employed with 360 Fire Prevention.[2] The audio recordings appear to support the account provided by Kent and his brother concerning the December 16 incident. On appeal, pointing to the audio recordings "proving that he did not threaten his employer," Kent argues his employer failed to meet "the burden of proof" to establish misconduct on his part and the Board's contrary determination "was not supported by [sufficient] credible evidence" in the record.

Ordinarily, "[o]ur scope of review of an administrative agency action is limited and highly deferential." In re Y.L., 437 N.J. Super. 409, 412 (App. Div. 2014). "So long as the Board's decision is supported by sufficient credible evidence in the record and was neither 'arbitrary, capricious, [nor] unreasonable,' it will be affirmed." Ibid. (alteration in original) (quoting Brady v. Bd. of Review, 152 N.J. 197, 210 (1997)). In making this determination, we "must examine: '(1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion.'" Ibid. (quoting Twp. Pharmacy v. Div.

---

[2] The Board took no position on Kent's motion to supplement the record.

of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283-84 (App. Div. 2013)).

We also normally "review factual findings made by an administrative agency deferentially." Ibid. "On appeal, 'the test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs.'" Ibid. (quoting Brady, 152 N.J. at 210). "So long as the 'factual findings are supported "by sufficient credible evidence, courts are obliged to accept them."'" Ibid. (quoting Brady, 152 N.J. at 210).

"Application of the substantial evidence rule presupposes an adequate opportunity by the party against whom a decision has been rendered to have marshalled and offered evidence." Jones v. Dep't of Corr., 359 N.J. Super. 70, 75 (App. Div. 2003). Additionally, when "an agency 'overlook[s] or underevaluat[es] . . . crucial evidence,' a reviewing court may set aside the agency's decision." Cottman v. Bd. of Review, 454 N.J. Super. 166, 171 (App. Div. 2018) (alterations in original) (quoting Trantino v. New Jersey State Parole Bd., 166 N.J. 113, 192 (2001)).

New Jersey's Unemployment Compensation Law is designed to reduce the impact of unemployment for workers who become unemployed without fault.

10

<u>Brady</u>, 152 N.J. at 221-22. However, N.J.S.A. 43:21-5(b) disqualifies individuals from benefits for six weeks when "the individual has been suspended or discharged for misconduct connected with the work. . . ." N.J.S.A. 43:21-5(b) defines "misconduct" as:

> [C]onduct which is improper, intentional, connected with the individual's work, within the individual's control, not a good faith error of judgment or discretion, and is either a deliberate refusal, without good cause, to comply with the employer's lawful and reasonable rules made known to the employee or a deliberate disregard of standards of behavior the employer has a reasonable right to expect. . . .

"Judicial attempts to imbue the term with substantive meaning have, however, insisted upon the ingredients of willfulness, deliberateness and intention if an employee's act is to qualify as misconduct." <u>Demech v. Bd. of Review</u>, 167 N.J. Super. 35, 38 (App. Div. 1979). "Inadvertent or unintentional acts, or simple neglectful conduct not amounting to a wanton disregard of consequences, will not so qualify." <u>Id.</u> at 38-39.

The Administrative Code defines insubordination as "an act of 'simple misconduct'" that permits discharge and requires that the employee satisfy one of the following:

> 1. Refused without good cause to comply with instructions from the employer, which were lawful, reasonable, and did not require the individual to

11

perform services beyond the scope of his or her customary job duties;

2. Acted beyond the expressed or implied authority granted to the individual by the employer; or

3. Violated a reasonable rule of the employer which the individual knew or should have known was in effect.

[N.J.A.C. 12:17-10.5.]

Insubordination has also been defined as: "'a wil[l]ful refusal of submission' to the authority of her superiors," Laba v. Newark Bd. of Educ., 23 N.J. 364, 385 (1957) (quoting Harrison v. State Bd. of Educ., 134 N.J.L. 502, 505 (Sup. Ct. 1946)); the "willful disregard of an employer's instructions," or an "act of disobedience to proper authority." Black's Law Dictionary 802 (7th ed. 1999).

"To sustain disqualification from benefits because of misconduct under . . . subsection (b), the burden of proof is upon the employer, who shall, prior to a determination by the department of misconduct, provide written documentation demonstrating that the employee's actions constitute misconduct . . . ." N.J.S.A. 43:21-5(b). In some cases, courts have found that "a single incident can constitute misconduct." Smith v. Bd. of Review, 281 N.J. Super. 426, 432 (App. Div. 1995) (finding that an orderly who brought food to a preoperative patient after being specifically instructed by a nurse that the patient was not to be fed, was disqualified from benefits based on misconduct).

However, the court in Demech found that "the single episode of spontaneous minor violence made in response to clearly provocative conduct cannot be considered misconduct in an unemployment compensation context" when an employee hurled a twenty-five-pound roast at a co-worker who had persistently and unremittingly verbally and physically abused her. 167 N.J. Super. at 40.

Here, the Appeal Tribunal found that Charles "was going to talk to [Kent]" about "issues regarding speeding and not following protocol and not telling the truth about his whereabouts during the work day" and "then consider termination if he did not feel that his answers were truthful." (Emphasis added). However, the Tribunal determined that the "misconduct connected with the work" for which Kent was terminated constituted "insubordination, yelling and being confrontational with the employer" during the December 16 encounter. In reaching that conclusion, the Tribunal accepted the employer's account of the December 16 incident and rejected Kent's version as lacking credibility.

Neither the Tribunal nor the Board addressed the audio recordings provided by Kent to support his appeal. Because the audio recordings, which provided crucial evidence to discredit the employer's account and confirm Kent's version, were clearly overlooked, we are obliged to "set aside the agency's decision." Cottman, 454 N.J. Super. at 171. We conclude that the Board acted

13

unreasonably in declining to reopen the record so that the audio recordings could be considered. The Board, through the Tribunal or itself, shall reopen the record, consider the audio recordings and any evidence produced in response, re-evaluate the evidence in the record, and issue a new decision on Kent's request for unemployment benefits.[3] We do not offer a view on the merits of Kent's entitlement to benefits; rather, those issues are to be decided anew by the Board on the augmented record.

Vacated and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] We note that while the employer's allegations about Kent's job performance may have constituted misconduct connected with the work to sustain Kent's discharge under N.J.S.A. 43:21-5(b), the Tribunal specifically found that Kent was not terminated based on those allegations which Kent also disputed.